[PUBLISH]

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 20-14292

_____

CLUB MADONNA INC.,
a Florida corporation d.b.a. Club Madonna,

Plaintiff-Appellant-
Cross Appellee,

*versus*

CITY OF MIAMI BEACH,
a Florida municipal corporation,

Defendant-Appellee-
Cross Appellant.

―――――――――――

Appeals from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:16-cv-25378-FAM

―――――――――――

Before NEWSOM and MARCUS, Circuit Judges, and STORY,★ District Judge.

MARCUS, Circuit Judge:

Over and over, laws regulating adult entertainment establishments have raised constitutional questions. The law at issue today is no different.

After a thirteen-year-old victim of human trafficking performed at the City of Miami Beach ("the City")'s only fully nude strip club, Club Madonna, Inc. ("the Club"), the City came down hard on the Club. It enacted two closely intertwined ordinances (collectively, "the Ordinance") that required all nude strip clubs to follow a record-keeping and identification-checking regime in order to ensure that each individual performer is at least eighteen years old -- the records of which the City could demand to see at any time -- or face stiff penalties. The passage of the Ordinance

―――――――――――

★ Honorable Richard W. Story, United States District Judge, for the Northern District of Georgia, sitting by designation.

sparked a years-long legal fight between the Club and the City, which reached this Court once before and is before us again.

The Club's challenges implicate several questions of first impression. The Club says that the Ordinance violates the First and Fourth Amendments, and that it is partially preempted by federal and state law. The district court ruled for the City at summary judgment on the Club's first two claims, ruled for the Club on its federal preemption claim at summary judgment, and ruled for the City on the Club's state law preemption claim at the motion-to-dismiss stage for failure to state a claim. The Club now appeals the court's rulings on its First Amendment, Fourth Amendment, and state law preemption claims. Meanwhile, the City cross-appeals the district court's ruling on the Club's federal preemption claim.

We affirm on all counts. First, although the Ordinance implicates the First Amendment because it singles out an industry that engages in expressive activity for special regulation, we still affirm because the Ordinance satisfies intermediate scrutiny. Second, the Ordinance's warrantless-search provision does not violate the Fourth Amendment because the adult entertainment industry is a closely regulated industry for Fourth Amendment purposes, and the warrantless-search provision satisfies the administrative-search exception because it can be narrowly read to avoid Fourth Amendment concerns. Third, the Ordinance's employment-verification requirement that any worker or performer "[i]s either a U.S. Citizen, legal resident, or otherwise legally permitted to be employed within the United States of America" is preempted by federal

immigration law because federal law exempts businesses from verifying the employment eligibility of independent contractors and casual hires -- the type of workers that the Ordinance directly targets -- so the statute's penalty scheme for enforcing that employment-eligibility requirement stands as an obstacle to the federal regulatory system.    And finally, the Club's state law conflict preemption claim fails because there is no Florida law that cabins the City's ability to levy fines against the Club for violating the Ordinance's requirements.

## I.

The story of this case starts with a tragic set of facts.  On January 6, 2014, City law enforcement officers discovered that a thirteen-year-old victim of human trafficking was being forced to dance nude at the Club after she ran away from home and was taken by four adult captors.  The City issued an emergency order that suspended the Club's occupational licenses for six months, but it reinstated the licenses after the Club agreed to issue written security standards, hire a Chief Compliance Officer, check at least two forms of identification before letting a performer dance, and maintain records of which performers could dance at the Club.

This detente ended quickly.  The Club repeatedly failed to follow its agreement with the City, and the City was not pleased. To put teeth in its regime, the City passed the Ordinance.  We previously described the Ordinance's requirements this way:

First, Section 18-913 requires nude dancing establishments such as the Club to check the age and work eligibility of "any worker or performer" by requiring that they "provide proof of an original, lawfully issued state or federal photo identification, and one additional form of identification." The owner or manager of the establishment must also "[v]erify the accuracy" of the documents by making a "sworn statement . . . confirming that the individual performer is at least 18 years of age." In the same sworn statement, the owner or manager must "[c]onfirm" that the worker is "performing of her or his own accord, and is not being forced or intimidated into performing or working." Code of the City of Miami Beach § 18-913. Section 18-913 also requires the business to keep a log of workers as they enter and exit the premises and to make all of the required documentation available "for inspection by the city upon demand." *Id.*

. . .

Finally, Section 18-915 describes the penalties for failure to comply with the requirements of Sections 18-913. . . . For a first, second, and third offense within specified time periods, a business shall be fined $5,000, $10,000, and $20,000, respectively. For a second offense within three years, the City will shut down the business for three months. And a third offense allows the City to exercise its discretion to close the business for up to a year. Code of the City of Miami Beach § 18-915. An establishment charged with

6                    Opinion of the Court                    20-14292

> violating the ordinance has a right to an administra-
> tive hearing and may appeal the decision to "a court
> of competent jurisdiction." *Id.*

*Club Madonna, Inc. v. City of Miami Beach*, 924 F.3d 1370, 1376 (11th Cir. 2019) (hereinafter "*Club Madonna I*"). Along with verifying that the performer or worker is at least eighteen years old, the Ordinance requires that nude dancing establishments confirm she "[i]s either a U.S. Citizen, legal resident, or otherwise legally permitted to be employed within the United States of America." Code of the City of Miami Beach § 18-913(1)(b).

## II.

Unhappy with this development, the Club sued the City of Miami Beach in the Southern District of Florida on December 30, 2016, challenging the constitutionality of the Ordinance and the City's use of its emergency powers to suspend the Club's business license. In its Complaint, the Club threw the kitchen sink at the Ordinance: It challenged the Ordinance under the First Amendment, the Fourth Amendment, the Fourteenth Amendment (raising both Due Process Clause and Equal Protection Clause claims), and the Eighth Amendment, and on Contract Clause and Supremacy Clause grounds.[1] The City moved to dismiss on many grounds

---

[1] We described these claims in detail in our first review of the case:

> Counts I through VI all concern the City's actions in
> response to the execution of the search warrant and challenge

20-14292                Opinion of the Court                7

(including failure to state a claim, standing, mootness, and ripeness), and the district court granted the City's motion.  The Club

---

laws existing at that time, before the enactment of the new Ordinance.  More specifically, Count I presented a facial challenge to the ordinances that authorized the City to close the Club on an emergency basis and asserts that they impose an unlawful prior restraint under the First Amendment; Count II lodges the same argument, only as applied to the Club.  And Count III alleges that these ordinances are facially unconstitutional under the Due Process Clause.  Count IV contests the facial constitutionality of the City's post-deprivation procedures in particular under the Due Process Clause; Count V makes the same argument as applied to the Club.  Count VI asserts that the City's use of the local laws to suspend its business license violated the First Amendment and the Due Process Clause because, according to the complaint, the City acted in bad faith and for retaliatory reasons.

Counts VII through XVI concern the legality of the Ordinance enacted in the wake of the police investigation.  Count VII contends that the Ordinance imposes an unconstitutional burden on the Club's First Amendment rights.  Count VIII alleges that the Ordinance is an unconstitutional tax on speech. Count IX challenges the Ordinance as a violation of the Equal Protection Clause.  Count X argues that the Ordinance is unconstitutionally vague.  Count XI posits that the Ordinance violates the Contract Clause.  Count XII takes issue with the penalty provision, claiming it violates the Eighth Amendment. Counts XIII, XIV, and XV allege that the Ordinance is preempted by state and federal laws.  And finally, Count XVI contends that the inspection provision of the Ordinance violates the Fourth Amendment.

*Club Madonna I*, 924 F.3d at 1376–77.

appealed to this Court, and we affirmed in part and reversed in part, reinstating the Club's First Amendment, unconstitutional tax, Contract Clause, Equal Protection Clause, federal preemption, state preemption, and Fourth Amendment claims because they were ripe for adjudication. *Club Madonna I*, 924 F.3d at 1383. On remand, the City again moved to dismiss the Club's claims, and after referring them to the magistrate judge, the district court granted the City's motion only for the Club's unconstitutional tax, Equal Protection Clause, Contract Clause, and state preemption claims, leaving the Club's First Amendment (Count VII), federal preemption (Count XIII), and Fourth Amendment (Count XVI) claims to be resolved at summary judgment.

Like the City's renewed Motion to Dismiss, the district court referred the Motion for Summary Judgment to the magistrate judge. The magistrate judge, in his Report and Recommendation ("R&R"), concluded that the Ordinance (1) violated the Club's First Amendment rights because it overburdened the Club's protected speech; (2) violated the Club's Fourth Amendment rights because, although the Club's business fell into the category of a closely regulated industry, the Ordinance's unfettered warrantless-search provision was unnecessary to further the City's interest in preventing human trafficking; and (3) was conflict preempted by the Immigration Reform and Control Act of 1986 ("IRCA"), 8 U.S.C. § 1324a *et seq.*, because the federal statute excludes independent contractors and casual hires from the requirement that any worker or

20-14292            Opinion of the Court            9

performer is "legally permitted to be employed within the United States[.]"

After receiving objections to the R&R, the district court ruled on the parties' cross-motions for summary judgment. Although the district court adopted the magistrate judge's findings on the Club's federal preemption claim, the district court declined to adopt his conclusions about the Club's First and Fourth Amendment claims.

The court began by rejecting the R&R's conclusions about the Club's First Amendment claim. First, it determined that the First Amendment did not apply at all because the Ordinance did not target expressive conduct. Citing the Supreme Court's decision in *Arcara v. Cloud Books*, 478 U.S. 697 (1986), the district court reasoned that since the Ordinance does not single out First Amendment expression, the First Amendment does not apply -- even if the law has incidental effects on the Club's freedom of expression. The court also explained that even if the Ordinance had targeted expressive conduct, it was narrowly tailored and not overly burdensome. The district court concluded that the Ordinance was a reasonable time, place, and manner restriction on the Club's protected activities under the First Amendment.

Second, the trial court also rejected the magistrate judge's determination about the Club's Fourth Amendment claim. For starters, it reasoned that nude dancing clubs are closely regulated for Fourth Amendment purposes because of their history of pervasive regulation. The court also found that the Ordinance's

warrantless-search provision was constitutionally reasonable under the administrative-search test the Supreme Court articulated in *New York v. Burger*, 482 U.S. 691, 702 (1987), because surprise inspections were necessary to ensure the Club complied with the Ordinance, and the certainty and regularity of the Ordinance's application provided an adequate constitutional substitute for a warrant.

Finally, the district court concluded that the requirement the Club verify that the performer or worker is a "U.S. Citizen, legal resident, or otherwise legally permitted to be employed within the United States of America" is conflict preempted under the Immigration Reform and Control Act of 1986. The district court reasoned that Congress deliberately intended to exempt casual hires and independent contractors from the IRCA, so the City could not enact an ordinance that requires the verification of employment eligibility of all workers.

The Club timely appealed the dismissal of its state law preemption claim and the entry of summary judgment for the City on its First and Fourth Amendment claims. The City cross-appealed the district court's order on the Club's federal preemption claim.

### III.

We review a district court's order on "summary judgment *de novo*, applying the same legal standards used by the district court[,]" *Yarbrough v. Decatur Hous. Auth.*, 941 F.3d 1022, 1026

(11th Cir. 2019) (quotation marks omitted), and we also review a district court's dismissal for failure to state a claim *de novo*. *Starship Enters. of Atlanta, Inc. v. Coweta Cnty.*, 708 F.3d 1243, 1252 (11th Cir. 2013).

We begin with the Club's First Amendment claim. The district court dismissed it because the Ordinance did not implicate the First Amendment under *Arcara*, and even if it did, the Ordinance was narrowly tailored to achieve a substantial interest. Our first task is to determine if the First Amendment is even implicated. The First Amendment prevents the government from "abridging the freedom of speech," U.S. CONST. amend. I, but not all government action implicates the First Amendment. Two Supreme Court cases illuminate the issue. In *Arcara*, the Supreme Court considered whether a county's closure of an adult bookstore, because there was documented evidence that individuals were soliciting prostitution on the bookstore's premises, violated the bookstore's First Amendments rights. 478 U.S. at 700–03. The New York Court of Appeals concluded that the First Amendment was implicated, applying the Court's reasoning in *United States v. O'Brien*. *Id.* at 701 (citing 391 U.S. 367 (1968)). In *O'Brien*, the Supreme Court said that when a law targets both speech and non-speech elements that are combined in the same course of conduct, the law will be upheld if (1) the law is grounded in a substantial governmental interest, and (2) the incidental restriction on speech is no broader than necessary to further that interest. *Id.* at 478 U.S. at 702–03 (citing 391 U.S. at 376–77). Because the bookstore's

closure would have an incidental effect on its freedom of expression (selling adult books), the New York Court of Appeals reasoned that *O'Brien* applied. *Id.* at 702.

The Supreme Court disagreed, holding that the First Amendment was not implicated at all. It explained that "unlike the symbolic draft card burning in *O'Brien*, the sexual activity carried on in this case [prostitution] . . . manifest[ed] absolutely no element of protected expression." *Id.* at 705 (first alteration added). The Court emphasized that "First Amendment values may not be invoked by merely linking the words 'sex' and 'books.'" *Id.*

The Court also considered -- and distinguished -- *Minneapolis Star & Tribune Company v. Minnesota Commissioner of Revenue*. *Id.* at 704 (citing 460 U.S. 575 (1983)). In *Minneapolis Star*, the Court struck down a state use tax[2] that specifically targeted the sale of large quantities of newsprint and ink because it had the specific effect of singling out newspapers. 460 U.S. at 592–93. Because "the burden of the tax inevitably fell disproportionately -- in fact, almost exclusively -- upon the shoulders of newspapers exercising the constitutionally protected freedom of the press," the legislation "imposed a greater burden of justification on the State." *Arcara*, 478 U.S. at 704.

---

[2] The Court explained that a use tax "requires the resident who shops out-of-state to pay a use tax equal to the sales tax savings. . . . Thus, in general, items exempt from the sales tax are not subject to the use tax." *Minneapolis Star*, 460 U.S. at 581–82.

The Court explained the difference between the use tax and generally applicable regulations, which do not implicate the First Amendment. Minnesota "created a special tax that applies only to certain publications protected by the First Amendment . . . [and] singl[es] out publications for treatment that is . . . unique in [its] tax law." *Minneapolis Star*, 460 U.S. at 581. The Court suggested that the object of the law related to the suppression of the state newspapers' expressive conduct -- a goal that "is presumptively unconstitutional." *Id.* at 585.

*Arcara* distinguished *Minneapolis Star* because the bookstore's closure did not "disproportionate[ly] burden" a specific speaker. 478 U.S. at 704. Since the law at issue in *Arcara* was a rule of general application -- a statute criminalizing prostitution -- the store could not "claim special protection . . . simply by virtue of [its] First Amendment protected activities." *Id.* (explaining that if the store was closed due to fire code or health code violations, "the First Amendment would not aid the owner of premises who had knowingly allowed such violations to persist"). Tipping its hat to *Minneapolis Star*, the Court explained that the First Amendment is implicated when a law that regulates "nonexpressive activity has the inevitable effect of singling out those engaged in expressive activity." *Id.* at 706–07.

*Arcara* and *Minneapolis Star* require us to perform a searching analysis to determine whether the statute or ordinance at issue -- which does not directly regulate speech or expressive activity -- is a *neutral* law of *general* application. That is, even if the law does

not regulate speech on its face, the law may raise First Amendment concerns if it is aimed at, or if it involves the suppression of speech or expressive conduct. *See id.* at 703–04; *see also Church of Lukumi Babalu Aye v. City of Hialeah*, 508 U.S. 520, 540–45 (1993) (concluding that a series of municipal ordinances regulating animal sacrifice, a religious practice that is a principal form of devotion for members of the Santeria faith, were not neutral laws of general applicability and were therefore subject to strict scrutiny for burdening the plaintiff's religion in violation of the Free Exercise Clause).

With these essential precedents in mind, we conclude that the City's Ordinance implicates the First Amendment. For starters, the law is not one of general applicability. Unlike the general law criminalizing prostitution in *Arcara*, the City's Ordinance applies exclusively to nude dancing clubs in the City, out of which the Club is in a class of one. Although there could be additional nude dancing establishments in the City of Miami Beach, the law still targets a specific industry, and a very limited one at that, much like how the use tax in *Minneapolis Star* specifically targeted newspapers.

Moreover, the law is not neutral because it implicates expressive conduct in a real way. The Ordinance imposes significant record-keeping and identification-verification requirements on the Club that do not directly touch on expressive conduct. But these requirements are part of the Ordinance's enforcement mechanism. The object of the Ordinance is to prescribe and regulate who can and who cannot dance nude -- a form of expressive conduct that, under binding precedent, is protected by the First Amendment.

*See Barnes v. Glen Theatre*, 501 U.S. 560, 566 (1991) (plurality opinion). The City has made a policy choice that those dancers who do not have the requisite paperwork whenever they enter adult entertainment establishments cannot perform. By taking aim only at nude dancing establishments and by proscribing who may dance, the City has waded into First Amendment waters.

We cannot accept the City's premise that by holding the First Amendment implicates the Ordinance, we are manufacturing an exception to *Arcara*. On the contrary, *Arcara* itself suggests today's result. The Court explained in *Arcara* that laws that "singl[e] out" or "disproportionate[ly] burden" those engaged in protected First Amendment activities implicate the First Amendment. 478 U.S. at 703–04. This Ordinance is such a law because it targets nude dancing establishments for special regulation, and it regulates who can dance.

Nor are we persuaded by the City's concern that this conclusion would prevent the government from curtailing unlawful conduct in industries that just happen to engage in First Amendment activities, or that the City would otherwise have to impose these regulations on all businesses in order to avoid First Amendment scrutiny. Merely saying that a statute "implicates" the First Amendment is a far cry from concluding that the First Amendment proscribes such regulations, or even that these regulations are subject to strict scrutiny. In *Barnes v. Glen Theatre*, the Supreme Court upheld the law under intermediate scrutiny, 501 U.S. at 567, and we have similarly upheld countless regulations targeting nude

dancing industries under the same standard of review. *See, e.g.*, *Flanigan's Enters., Inc. v. Fulton Cnty.*, 596 F.3d 1265, 1269 (11th Cir. 2010) (upholding an ordinance barring adult entertainment businesses from selling alcohol); *Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1365 (11th Cir. 1999) (upholding an hours limitation and minimum square footage requirement for adult entertainment businesses). It may be inconvenient for municipalities to defend their regulations in court, "[b]ut that is beside the point" because "[t]he First Amendment is often inconvenient. . . . Inconvenience does not absolve the government of its obligation to tolerate speech." *See Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 701 (1992) (Kennedy, J., concurring). The long and short of it is that this Ordinance implicates the First Amendment.

Our first step then would normally be to determine whether intermediate or strict scrutiny applies, but the parties make that easy for us because they both agree (as they must here) that the Ordinance should be evaluated under intermediate scrutiny. However, they disagree about what kind of intermediate scrutiny applies. The Club says that the intermediate scrutiny test derived from *O'Brien* should apply, while the City claims that the time, place, and manner test, which the Supreme Court employed in *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986), should control.

The *O'Brien* test is used "to evaluate regulations of expressive conduct -- conduct that contains both 'speech' and 'nonspeech'

elements." *Lady J. Lingerie*, 176 F.3d at 1364 (quoting *O'Brien*, 391 U.S. at 376)). In contrast, the time, place, and manner test outlined in *Renton* has generally been used to "review restrictions on expression taking place in public fora . . . [and] evaluate the validity of zoning regulations." *Lady J. Lingerie*, 176 F.3d at 1364. *Renton* instructs us that a "time, place, and manner" regulation must be narrowly tailored to serve a substantial governmental interest, while still allowing for reasonable alternative avenues of expression. *See* 475 U.S. at 49–54.

The tests enunciated in *Renton* and *O'Brien* fall under the general umbrella of intermediate scrutiny, and "[a]s a practical matter, there is little difference between" them. *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1297 (11th Cir. 2021); *see also Barnes,* 501 U.S. at 566 (explaining that both tests "embody much the same standards"). However, in *Lady J. Lingerie v. City of Jacksonville*, we observed that the tests are not the same, and they may lead to different results. 176 F.3d at 1364. We suggested that the time, place, and manner test provides more breathing room to the government because the *O'Brien* test requires slightly more narrow tailoring than the time, place, and manner test. *See id.* at 1364. The *O'Brien* test is slightly more searching because it evaluates laws that regulate expressive conduct, while the time, place, and manner test analyzes laws that regulate speech indirectly.

*Lady J. Lingerie* also guides us in deciding which test is preferable. There, a panel of this Court considered a city ordinance

that, among other things, limited the hours of operation of nude dancing clubs and required that rooms in such establishments be at least 1,000 square feet in size. *Id.* at 1365. We explained:

> [The] *Renton* test is appropriate because the rules we consider today . . . regulate "time" and "place" in the "time, place, or manner" sense. They affect, but do not directly regulate, the expressive conduct that is the basis of the plaintiffs' First Amendment challenges: nude dancing. The draft card burning statute in *O'Brien* and the indecency law in *Barnes* regulated the *how* of expressive conduct, as opposed to the where or the when, and they did so in a way that made the messages less potent. The hours of operation and 1000 square foot rules are different.

*Id.* at 1364–65 (emphasis in original); *see also Renton*, at 475 U.S. at 47–48 (emphasis in original) (explaining that when the "*predominate* concerns" of a regulation are "the secondary effects of adult theaters, and not [ ] the content of adult films[,]" then the goal of the ordinance is "unrelated to the suppression of free expression").

Since the Club challenges the Ordinance's compliance mechanism, the time, place, and manner test is the better fit. These regulations relate more to the "where or when" of the expressive conduct than the "how" because the repetitive identification-verification and log-in and log-out requirements -- which are the focus of the Club's ire -- delay *when* the Club's dancers can perform, much like the city's hours requirement in *Lady J. Lingerie.* The

20-14292               Opinion of the Court                    19

Ordinance's enforcement mechanism does not delineate how performers may dance or what they must wear.

When applying the time, place, and manner test, we consider whether the regulation (1) advances a substantial interest, (2) "is 'not substantially broader than necessary to achieve the government's interest,'" and (3) leaves open reasonable alternative avenues of communication. *Lady J. Lingerie*, 176 F.3d at 1365 (quoting *Ward*, 491 U.S. at 800). As for the first consideration, the City "must point to specific evidence it relied upon when drafting the Code that supports the conclusion that the Code advances its interest in preventing negative secondary effects." *Stardust, 3007 LLC v. City of Brookhaven*, 899 F.3d 1164, 1174 (11th Cir. 2018). If the City satisfies this inquiry, the burden shifts to the Club "to cast direct doubt on this rationale." *Id.*

The history of the Ordinance amply reveals that the drafters passed it in order to prevent human trafficking in strip clubs and minors from dancing nude on a public stage. *See, e.g.*, Doc. 150-1 at 3–5 (the City's Chief Deputy Attorney explaining at a City Commission Meeting that the Ordinance seeks to curb human trafficking, and that it requires two IDs as safeguards against the "rampant" use of counterfeit IDs in the City); Doc. 150-2 at 3–4 (a City Commissioner explaining at a City Commission Meeting that the Ordinance is "just [about] . . . safe guarding and keeping young kids from stripping at [the Club]"). The Club counters that the Ordinance has nothing to do with human trafficking because "it is merely an elaborate record-keeping law which could easily be

complied with by a diligent human trafficker." Appellant's Br. at 24. But the Club provides no evidence that the goal of the Ordinance was to simply punish or needlessly burden the Club. The City has satisfied the first *Renton* factor.

The next step in our analysis is narrow tailoring. In this exercise, we do not scrutinize the law too closely. Instead, "[t]he government need only have a reasonable basis . . . for believing that its policy will indeed further a legitimate interest." *Zibtluda, LLC v. Gwinnett Cnty. ex rel. Bd. of Comm'rs of Gwinnett Cnty.*, 411 F.3d 1278, 1286 (11th Cir. 2005) (quotation marks omitted). A reasonable basis "can consist of the experience of other cities, studies done in other cities, caselaw reciting findings on the issue, as well as [the officials'] own wisdom and common sense." *Id.* (alteration in original) (quotation marks omitted). Whether the statute survives narrow tailoring turns on "the reasonableness of the government regulation in light of the available evidence" and "requires deference to the reasoned judgment of a governmental entity." *Flanigan's*, 596 F.3d at 1279.

*Lady J. Lingerie* illustrates the substantial discretion, the breathing room we afford the government. In evaluating an ordinance that closed an adult entertainment store from the hours of 10:00 a.m. to 12:00 p.m., we explained that we would not analyze the specific hours during which the ordinance closed such businesses "as closely as the plaintiffs would have us" do:

> If we were to side with the plaintiffs here, the next
> litigants would argue whether evidence of secondary

> effects at 6:15 in the morning justifies requiring adult
> businesses to close at 9:30, or whether evidence from
> 9:30 justifies requiring them to close at 10:45.  That
> sort of line-drawing is inconsistent with a narrow tai-
> loring requirement that only prohibits regulations
> that are "substantially broader than necessary."

176 F.3d at 1365; *see also Ward*, 491 U.S. at 800 (alteration omitted and quotation marks omitted) ("The validity of time, place, or manner regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted.").

Turning to the text, the Ordinance consists of two sets of requirements: one applying at the start of the performer or worker's employment, and another when the performer or worker enters the establishment each day.  First, the strip club must require that each person produce two forms of identification confirming she is at least eighteen years old and is "working or performing" of her own accord.[3]  Code of the City of Miami Beach § 18-913(1).  The nude dancing establishment must then make copies of her forms of identification and her statement confirming she is

---

[3] The Ordinance also requires that the Club verify that the performer or worker "[i]s either a U.S. Citizen, legal resident, or otherwise legally permitted to be employed within the United States of America," but, as we explain below, that provision is conflict preempted under federal law and, therefore, we sever it from the Ordinance.  *See infra* at Section V, VII.

"working or performing" of her own accord, and it must "maintain copies of those documents" on its premises "at all times." *Id.* § 18-913(2)–(3). To confirm the accuracy of this information, the nude dancing establishment's manager must prepare and retain "a sworn statement . . . confirming that" the worker or performer is at least eighteen and performing of her own accord. *Id.* § 18-913(4).

Second, whenever the worker or performer "enter[s]" the establishment, the establishment must "[m]aintain a check in/check out procedure and log" whereby the worker or performer presents copies of her two forms of identification to the establishment's management, and she must "log[] in." *Id.* § 18-913(5). The performer must also "log[] out" upon "exiting" the establishment. *Id.* The log must include several other pieces of information, including: "[t]he name(s) of the manager(s) . . . on duty at the time of the log in and log out"; "[t]he worker or performer's actual name; a unique identifier, if any. . . ; the job title or role at the nude dancing establishment . . .; the log in and log out times"; and "[t]he manager who confirmed that the [above] identifications . . . were inspected and verified." *Id.* § 18-913(5)(a)–(c).

Although the Ordinance's requirements are significant and time-consuming, they are not "*substantially* broader than necessary" to achieve its aim of preventing minors and victims of human trafficking from performing. *See Ward*, 491 U.S. at 800 (emphasis added). The Ordinance's core identification and recordkeeping requirements are necessary to achieve the City's stated and obviously important interests in preventing human trafficking and barring

minors from dancing nude on a public stage. The requirement that workers or performers produce two forms of identification instead of just one -- which the Club says is unnecessarily burdensome -- combats the "rampant use" of counterfeit forms of identification on Miami Beach and reduces the likelihood that a victim of human trafficking or a minor will perform onstage. Given the significant latitude we afford policymakers, and our obligation to defer to a legislative body's reasoned judgment, we hold that these core identification-verification and record-maintenance requirements are reasonable when measured against the statute's aims. *See Zibtluda*, 411 F.3d at 1286; *Flanigan's*, 596 F.3d at 1279.

The Club protests that the requirement that a worker or performer complete the check-in/check-out procedure each time she enters or exits the establishment -- even if she had completed the procedure at the beginning of the day -- is unnecessary to accomplish the aim of preventing human trafficking.[4] The City cannot provide a completely satisfying explanation for why a performer or worker could become a minor or a victim of human trafficking if

---

[4] As an aside, although we may question the need to require *all* of the Club's workers -- including janitors and deejays, who are likely not minors or victims of human trafficking -- to comply with the Ordinance's identification-verification requirements, the Club has not made this argument in district court or on appeal, so we will not consider it here. *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004) (holding that arguments that were not raised at the district court in the first instance cannot be raised on appeal); *Timson v. Sampson*, 518 F.3d 870, 874 (11th Cir. 2008) (concluding that a party waives an argument if she does not raise it in her initial brief).

she were to reenter after stepping out during her shift for a smoke break or a cup of coffee.[5]

But the Ordinance's minor overreach does not make it "*substantially* broader than necessary" to achieve its desired ends. *See Ward*, 491 U.S. at 800. Again, judges are not policymakers, and the Ordinance will not be struck down "simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *See id.* As we explained in *Lady J. Lingerie*, parsing this point too finely would force us to engage in a "line-drawing [exercise that] is inconsistent with a narrow tailoring requirement that only prohibits regulations that are 'substantially broader than necessary.'" 176 F.3d at 1365 (quoting *Ward*, 491 U.S. at 800). We decline the invitation here because the narrow tailoring prong of *Renton*'s time, place, and manner test must afford the government some breathing room.

Finally, it is beyond question that the Ordinance leaves open reasonable alternative avenues of communication because the law does not regulate the Club's ability to engage in protected expression. Even if the paper process takes some time to complete each

---

[5] The City argues that it enforces the statute consistent with its reading of the Ordinance (that the log-in/log-out procedure need only happen once per day), however the text reads on its face. That may be so, "[b]ut the First Amendment protects against the Government; it does not leave us at the mercy of *noblesse oblige*. We would not uphold an unconstitutional statute merely because the Government promised to use it responsibly." *United States v. Stevens*, 559 U.S. 460, 480 (2010).

day, as the Club argues, the process still leaves the Club with plenty of hours in the day and night for its dancers to perform. At bottom, the First Amendment does not prevent the Club from dealing with administrative inconvenience -- it protects the dancers' mode of expressive activity.

In short, even though the Ordinance implicates the First Amendment, the law is narrowly tailored enough to satisfy intermediate scrutiny under *Renton*'s time, place, and manner test.

## IV.

Next up is the Club's argument that the Ordinance's warrantless-search provision violates the Fourth Amendment. The district court concluded that the provision is constitutional because (1) the nude dancing establishment industry is a closely regulated industry for Fourth Amendment purposes, and (2) the requirement is reasonable under the administrative-search test for closely regulated industries.

Let's start with the basics. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. Under the Fourth Amendment, "searches conducted outside the judicial process, without prior approval by a judge or a magistrate judge, are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions." *City of Los Angeles v. Patel*, 576 U.S. 409, 419 (2015) (cleaned up).

One of those exceptions is when the industry at issue is "closely regulated." In *City of Los Angeles, California v. Patel*, the Supreme Court explained that it has identified four closely regulated industries: liquor sales, firearms dealing, mining, and running an automobile junkyard. *Id.* at 424. *In Patel*, the Court declined to extend the closely regulated designation to the hotel industry. 576 U.S. at 424–25 (explaining that the fact that hotels are required to "maintain a license, collect taxes, conspicuously post their rates, and meet certain sanitary standards" does not reflect "a comprehensive scheme of regulation that distinguishes hotels from numerous other businesses"). Even though closely regulated industries are the exception and not the rule, *id.* at 424, the lower federal courts have recognized a number of additional industries as being closely regulated, including pharmaceuticals, the medical profession, food, nuclear power, storing and dispensing gasoline, construction, day care centers, nursing homes, asbestos removal, solid waste disposal, credit unions, pawnshops, banking, insurance, commercial trucking, purchase of precious metals and gems, casinos, adult entertainment stores, and massage parlors. Note, *Rethinking Closely Regulated Industries*, 129 HARV. L. REV. 797, 805–06 (2016) (collecting cases).

Whether an industry is closely regulated for Fourth Amendment purposes essentially turns on whether the industry has "such a history of government oversight that no reasonable expectation of privacy . . . could exist for a proprietor over the stock of such an enterprise." *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978).

"The element that distinguishes these enterprises from ordinary businesses is a long tradition of close government supervision, of which any person who chooses to enter such a business must already be aware." *Id.*

These principles translate well to the adult entertainment industry. Adult entertainment businesses have been heavily regulated historically. *See, e.g.*, *Erie*, 529 U.S. at 299, 302 (2000) (holding that an ordinance barring full nudity at nude dancing clubs does not violate the First Amendment); *Flanigan's*, 596 F.3d at 1269 (upholding an ordinance barring adult entertainment businesses from selling alcohol); *Lady J. Lingerie*, 176 F.3d at 1365 (upholding an hours limitation and minimum square footage requirement for adult entertainment businesses). These regulations "[c]ombat[] the harmful secondary effects of adult businesses, such as increased crime and neighborhood blight." *See Lady J. Lingerie*, 176 F.3d at 1361 (citing *Renton*, 475 U.S. at 50–52; *Barnes*, 501 U.S. at 583–84 (Souter, J., concurring)). The Fifth Circuit also has concluded that "sexually oriented businesses" are closely regulated under the Fourth Amendment. *FW/PBS, Inc. v. City of Dallas*, 837 F.2d 1298, 1306 (5th Cir. 1988), *aff'd in part, vacated in part on other grounds*, 493 U.S. 215 (1990) ("Communities long have been concerned about the effects of sexually oriented businesses and have attempted to cope with those effects through regulation. . . . We [therefore] hold that sexually oriented businesses face a degree of regulation that renders the inspection provision presumptively reasonable.").

Based on a substantial history of heavy regulation, we conclude that the nude dancing and adult entertainment industry is closely regulated for Fourth Amendment purposes so that no reasonable expectation of privacy could exist for the proprietor. From limitations concerning the hours of operation, to zoning restrictions, to prohibitions on their ability to serve alcohol, to rules governing the very size of the establishments, adult entertainment businesses are routinely -- and pervasively -- regulated by cities and municipalities.

Nevertheless, the Club offers two reasons why adult entertainment clubs should not be considered closely regulated. First, it says that several other industries -- such as day cares, dry cleaners, gas stations and "an endless list of other enterprises" -- are subject to special laws, yet those industries are not considered closely regulated. Second, the Club contends that adult entertainment clubs are subject to special treatment because they are entitled to First Amendment protections.

Neither argument is convincing. For one, those other industries are not before this Court. Moreover, apart from day care centers, which the Ninth Circuit has held is a closely regulated industry, see *Rush v. Obledo*, 756 F.2d 713, 720 (9th Cir. 1985), the Club provides no evidence that those other industries have a history of pervasive regulation. Regulations implicating dry cleaners and gas stations are much more likely to fall into the camp of rules that the Court rejected in *Patel* because they tend to be generic requirements that apply to all businesses. In contrast, the special rules that

govern the operation of adult entertainment clubs are unique to these kinds of clubs and diminish the negative secondary harms that these businesses may impose on the community. Moreover, the Club can point to no caselaw suggesting that simply because adult entertainment clubs are entitled to some First Amendment protections, they should not be considered closely regulated under the Fourth Amendment.

Since the Club operates in a closely regulated industry, we apply a more relaxed standard for interpreting whether a warrant-less-search ordinance is constitutional. The Supreme Court explained in *Burger* that the government must satisfy three criteria under the more relaxed administrative-search test:

> [1] [T]here must be a substantial government interest that informs the regulatory scheme pursuant to which the inspection is made . . . [2] the warrantless inspections must be necessary to further [the] regulatory scheme . . . [and] [3] the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant.

482 U.S. at 702 (cleaned up).

"It is by now axiomatic that a court must examine the totality of the circumstances in order to determine whether a search or seizure is reasonable under the Fourth Amendment." *United States v. Lewis*, 674 F.3d 1298, 1303 (11th Cir. 2012). "To meet the test of reasonableness, an administrative screening search must be

as limited in its intrusiveness as is consistent with satisfaction of the administrative need that justifies it." *Bruce v. Beary*, 498 F.3d 1232, 1248 (11th Cir. 2007) (quotation marks omitted).

Both parties agree that the first two requirements of the *Burger* test have been satisfied because curbing human trafficking and barring underage persons from dancing nude on a public stage are substantial governmental interests. And the Club, in its opening brief, does not seem to contest the City's argument that warrantless, surprise inspections are necessary to further the objects of the Ordinance's regulatory scheme. The only issue that remains is whether the Ordinance's warrantless-search provision provides "a constitutionally adequate substitute for a warrant."

On the third prong of this test, *Burger* explained:

[T]he regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers. To perform this first function, the statute must be sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes. In addition, in defining how a statute limits the discretion of the inspectors, we have observed that it must be carefully limited in time, place, and scope.

482 U.S. at 703 (citations and quotation marks omitted).  Searches that are "so random, infrequent, or unpredictable that the owner, for all practical purposes, has no real expectation that his property will from time to time be inspected by government officials" will not be permitted.  *Donovan v. Dewey*, 452 U.S. 594, 599 (1981).

The Club's chief argument is that the Ordinance does not satisfy the third prong because it does not have reasonable temporal restrictions, and warrantless-search provisions that lack these restrictions do not provide a constitutionally adequate substitute for the warrant requirement.  But in *United States v. Ponce-Aldona*, we concluded that the lack of temporal restrictions in warrantless, surprise searches "is insignificant in the context of regulation of the commercial trucking industry."  579 F.3d 1218, 1226 (11th Cir. 2009).  And in *Crosby v. Paulk*, we held that a statute authorizing warrantless administrative searches of a liquor store "at any time" was constitutionally permissible, since providing a more definitive period would "frustrate[] the purpose of the administrative search[.]" 187 F.3d 1339, 1348 (11th Cir. 1999) (quotation marks omitted).

For further guidance, we return to Supreme Court precedent.  The Court has upheld warrantless-search requirements when the searches were necessary to further the regulatory scheme at issue.  In *Donovan v. Dewey*, the Court sustained warrantless searches of mines, which were limited to at least two annual searches of all surface mines and four annual searches of all underground mines, because the searches were necessary due to the

"notorious ease with which many safety or health hazards may be concealed if advance warning of inspection is obtained." 452 U.S. at 603–04 (quotation marks omitted). Moreover, in *Burger*, the Supreme Court upheld the state's warrantless searches of automobile junkyards, which were conducted on a "regular basis" and only "during [ ] regular and usual business hours," because those searches were needed to identify stolen items before they were resold. 482 U.S. at 711 (quotation marks omitted).

In *Patel*, the Court concluded that a statute that authorized warrantless searches of a hotel's guest records, with the only caveat being that the searches should be conducted "at a time and in a manner that minimizes any interference with the operation of the business" whenever possible, violated the Fourth Amendment because the justification -- preventing falsification of records or avoiding administrative burdens -- was not sufficient to satisfy the third prong. 576 U.S. at 412–13, 427–28 (quotation marks omitted) (distinguishing *Dewey* and *Burger* because, although those decisions upheld regulatory schemes that had some temporal limitation, the statute at issue "imposes no comparable standard").

Applying these principles to the Ordinance, we offer these observations. For starters, the lack of strict temporal limitations is essential to the effectiveness of the City's regulatory scheme. Plainly, the City needs to access the Club's records with surprise inspections in order to ensure continuous compliance, particularly since the Club has been caught sleeping before, and the consequences may be so serious for underage performers. On the other

hand, if the City can enter the Club or fine it for failing to produce the required documents when the Club is completely closed (that is, when no member of the Club's management is present to receive and process the City's request), the Ordinance would raise more problems under the Fourth Amendment.

We need not wade into these waters because we construe the statute more narrowly than the capacious reading the Club offers. The Ordinance's warrantless-search provision provides that the documents and logs that the statutory scheme requires the Club to maintain "must be available for inspection by the city *upon demand*, and the nude dancing establishment shall not refuse access to these documents for inspection by the city." Code of the City of Miami Beach § 18-913 (emphasis added). The Club says that the statute authorizes the City to search the Club's records "at any time." Appellant's Br. at 8. But the statute does not say "at any time." Rather, it says, "upon demand."

"We begin our construction of [a statutory provision] where courts should always begin the process of legislative interpretation, and where they often should end it as well, which is with the words of the statutory provision." *Harris v. Garner*, 216 F.3d 970, 972 (11th Cir. 2000) (en banc). Demand means, "[t]o claim as one's due; to require; to seek relief." *Demand*, BLACK'S LAW DICTIONARY (11th ed. 2019). But, based on the clear context, the demand from the City is a demand for the Club *to produce* the documents discussed in the statutory scheme. A "demand to produce" is "[t]he assertion of a right to have *someone* provide or bring forward

something." *Demand to Produce*, BLACK'S LAW DICTIONARY (11th ed. 2019) (emphasis added). The City cannot demand that the Club provide the documents enumerated by the statute, documents necessarily maintained on its premises at all times, Code of the City of Miami Beach § 18-913(2), (3), when no Club employee is on site to process the City's request. For the City to assert its right, someone must be present at the Club to produce the onsite documents the City has requested. We interpret the "on demand" language in the Ordinance's warrantless-search provision to mean that any authorized City official can inspect the documents enumerated in Section 18-913 during the Club's regular business hours *or* when a member of the Club's administrative staff is present and able to process the City's request.

The constitutional avoidance canon also provides that "[a] statute should be interpreted in a way that avoids placing its constitutionality in doubt." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 247 (2012). The Supreme Court has explained that this canon "is a tool for choosing between competing plausible interpretations of a statutory text, resting on the reasonable presumption that Congress did not intend the alternative which raises serious constitutional doubts." *Clark v. Martinez*, 543 U.S. 371, 381 (2005).

Our narrower and plausible reading of the Ordinance's warrantless-search requirement avoids the Fourth Amendment problem we've discussed. The Supreme Court struck down the regulation in *Patel* precisely because it lacked any reasonable temporal

limitations without justification, while the regulation in *Burger* limited inspections to reasonable business hours, and it was upheld. While the statutory scheme in *Dewey* lacked detailed temporal limitations, the Court upheld it because the scheme was meant to prevent mines from concealing a lack of compliance. We avoid tackling this problem by reading the Ordinance to restrict the City's power to invoke the Ordinance's warrantless-search provision to the hours when the Club's administrative staff is (or, during regular business hours, should be) available to fulfill the City's request.

When read this way, we are satisfied that the Ordinance meets each prong of the administrative-search test under *Burger* and that it complies with the Fourth Amendment.

## V.

Unlike its First Amendment and Fourth Amendment claims, the Club won on its federal preemption argument in district court. The City has cross-appealed on this issue. The Club's principal conflict preemption argument is that Congress explicitly intended to exempt employers from verifying the employment eligibility of contract workers or casual hires in the IRCA. *See* 8 U.S.C. § 1324a *et. seq.* According to the Club, Section 18-913(1)(b) of the City's Ordinance stands as an obstacle to the goals of federal law by requiring the Club to verify that all workers and performers are U.S. citizens, legal residents, or lawfully able to work in the United States. The district court agreed with the Club's reasoning. We do as well.

The doctrine of federal preemption derives its power from the Supremacy Clause.  "[T]he Supremacy Clause provides a clear rule that federal law 'shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'" *Ariz. v. United States*, 567 U.S. 387, 399 (2012) (quoting U.S. CONST. art. VI, cl. 2.).  Under the Supremacy Clause, Congress has the power to preempt state and local laws when they conflict with federal law.  *Id.*

Federal law can preempt state law through express preemption, conflict preemption, or field preemption.  *Id.*  Express preemption occurs when "the text of a federal statute explicitly manifests Congress's intent to displace state law."  *United States v. Ala.*, 691 F.3d 1269, 1281 (11th Cir. 2012).  "Conflict preemption occurs either when it is physically impossible to comply with both the federal and the state laws or when the state law stands as an obstacle to the objective of the federal law."  *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1167 (11th Cir. 2008).  "Field preemption occurs when a congressional legislative scheme is 'so pervasive as to make the reasonable inference that Congress left no room for the states to supplement it.'"  *Id.* (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

As we explained in *United States v. Alabama*, we follow two considerations when determining whether a federal statute preempts state law.  First, we look at Congress's purpose in enacting the federal law.  *Ala.*, 691 F.3d at 1282.  Second, we are guided

by the assumption "that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)) (quotation marks omitted).

With these principles in mind, we consider the Club's three preemption challenges.  First, the Club says that Section 18-913(1)(b) is conflict preempted because it requires nude dancing establishments to verify the immigration status of independent contractors.  Second, it claims that Sections 18-913(1)(b), 18-915(a), and 18-915(c) are expressly preempted under the IRCA because they impose sanctions for failure to verify immigration status, which are specifically prohibited by federal law.  Finally, the Club argues that Section 18-913(1)(b) is conflict preempted because it disallows certain forms of identification that are acceptable under federal law.

Because the district court reached its decision solely on the Club's first conflict preemption claim, we begin there.

To guide our conflict preemption analysis, we turn to the Supreme Court's treatment of a similar preemption claim in *Arizona v. United States*.  There, the Supreme Court considered a conflict preemption challenge to an Arizona law that made it a misdemeanor for "an unauthorized alien to knowingly apply for work, solicit work in a public place or perform work as an employee or independent contractor" in the state.  *Ariz.*, 567 U.S. at 403 (quoting ARIZ. REV. STAT. ANN. § 13-2928(C)).  Explaining that the IRCA created "a comprehensive framework for combatting the employment of illegal aliens," and that the statutory text and legislative

history of the IRCA evidenced that Congress specifically chose not to impose criminal penalties on aliens who sought employment, the Court held that "Congress made a deliberate choice not to impose criminal penalties on aliens who seek, or engage in, unauthorized employment." *Id.* at 404–05 (quotation marks omitted). The Court elaborated, "[the] IRCA's framework reflects a considered judgment that making criminals out of aliens engaged in unauthorized work -- aliens who already face the possibility of employer exploitation because of their removable status -- would be inconsistent with federal policy and objectives." *Id.* at 405.

"We use our judgment to determine what constitutes an unconstitutional obstacle to federal law, and this judgment is 'informed by examining the federal statute as a whole and identifying its purpose and intended effects.'" *Ala.*, 691 F.3d at 1281 (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000)). To that end, we examine the statutory text, its regulatory framework, and, if necessary, the legislative history of the IRCA to determine whether Congress made a deliberate choice to exclude independent contractors and casual hires from the employment-verification process. Then we examine whether the Ordinance's verification requirements stand as an obstacle to that objective.

Let's start with the federal statute. The IRCA specifically prohibits the "hir[ing], or [ ] recruit[ment] . . . for employment in the United States an alien knowing the alien is an unauthorized alien . . . with respect to such employment, or . . . hir[ing] for employment . . . without complying with the requirements" of the

statute. 8 U.S.C. § 1324a(a)(1). Notably, these requirements apply only to "employment[.]" Expressly, they do not apply to independent contractors or casual hires because, otherwise, Congress would not have included "employment" in the statutory provision at all.

The IRCA's regulatory framework, promulgated by the Department of Homeland Security ("DHS"), corroborates our interpretation of the statute. For example, the regulations exclude "independent contractor[s]" and "those engaged in casual domestic employment" from the definition of "employee" under the IRCA. 8 C.F.R. § 274a.1(f). Section 274a.2(b) of the regulations likewise only requires employers to verify work eligibility of employees. *Id.* § 274a.2(b). To put matters to rest, the regulations even exclude companies that hire or use "contract labor" from the definition of "employer." *Id.* § 274a.1(g).

If the statutory text and the DHS regulations weren't enough, the IRCA's legislative history makes it crystal clear that the omission of independent contractors and casual hires from the IRCA's employment-verification requirements was intentional. Specifically, the House Report reveals that Congress explicitly intended to exempt casual hires or independent contractors from the employment verification process. *See* H.R. REP. NO. 99-682, at 57 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5661 ("It is not the intent of this Committee that sanctions would apply in the case of casual hires (i.e., those that do not involve the existence of an employer/employee relationship)."). In other words, Congress made

a deliberate decision to limit the scope and impact of the IRCA's employment-verification requirements.

Seeing that the City's Ordinance instructs nude dancing establishments to verify that "*any* worker or performer" is "legally permitted to be employed within the United States," *see* Code of the City of Miami Beach § 18-913(1) (emphasis added), the Ordinance requires the Club to verify the employment eligibility of independent contractors and casual hires -- precisely the kinds of workers that Congress purposefully exempted from the IRCA. The Ordinance therefore stands as an obstacle to the accomplishment of one of Congress's objectives in enacting the IRCA.

We are not alone in reaching this conclusion. Considering similar conflict preemption challenges to comparable state and local laws, the Third and Tenth Circuits both concluded that such statutes are conflict preempted by the IRCA. Thus, for example, in *Lozano v. City of Hazelton*, the Third Circuit determined that a city ordinance was conflict preempted because it required employers to verify the employment status of independent contractors. 724 F.3d 297, 313 (3rd Cir. 2013). The court explained that "[i]n striking the intricate balance that [led] to the enactment of IRCA, Congress deliberately excluded independent contractors and other non-employees from the scope of the restrictions contained in the statute." *Id.* at 306. The court reached this conclusion largely based on the textual provisions and the legislative history of the IRCA that we have referenced, which show that "Congress explicitly declined to sanction employers based on the work

20-14292              Opinion of the Court                    41

authorization status of casual hires[.]" *Id.* (quotation marks omitted). This choice was "a deliberate distinction that Congress included as part of the balance it struck in determining the scope and impact of IRCA's employer sanctions." *Id.* at 307. Because the municipal statute at issue ignored the distinction drawn by Congress, in *Lozano*, our sister circuit held that the ordinance was conflict preempted under the IRCA. *Id.* at 213.

The Tenth Circuit reached the same conclusion in *Chamber of Commerce of the United States v. Edmondson. See* 594 F.3d 767 (10th Cir. 2010). The court held that an Oklahoma statute that required entities to verify the work eligibility of independent contractors was conflict preempted. 594 F.3d at 750. Upon reviewing the same statutory text and legislative history of the IRCA, the court concluded that the Oklahoma statute, by requiring employers to verify the work eligibility of independent contractors, "would create obligations on contracting entities that Congress expressly chose not to impose." *Id.* at 770.

We can discern no reason to depart from the reasoning found in *Lozano* and *Edmondson.* Not only does the statute's text and its regulatory framework exempt employers from verifying the employment status of independent contractors or casual hires, but also the statute's legislative history removes any doubt over whether that decision was a calculated choice on the part of Congress. We see no daylight between the laws at issue in *Lozano* and *Edmondson* and Section 18-913(1)(b). Each requires the employer

to verify the employment eligibility of casual hires or independent contractors.[6]

The City offers two arguments in rebuttal. First, the City says that the Ordinance's regulation falls within the IRCA's "savings clause," citing *Chamber of Commerce of the United States v. Whiting*, 563 U.S. 582 (2011), in support. Second, the City argues that the Club cannot succeed on its facial challenge to the statute because it cannot prove that the Ordinance is preempted in *all* circumstances. Neither argument is convincing.

The City's *Whiting* argument goes nowhere fast because the IRCA's savings clause "does *not* bar the ordinary working of conflict pre-emption principles." *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 869 (2000) (emphasis in original). That Congress decided to permit state and local governments to enact licensing and similar

---

[6] Our concurring colleague suggests that the laws at issue in *Lozano* and *Edmonson* are different than the Ordinance because those laws applied to all businesses, whereas the Ordinance applies to only one class of businesses (and one establishment at that). *See* Concurring Op. at 8–9. But nothing in our caselaw indicates that, because a state or municipality selectively imposes regulatory requirements that conflict with Congress's commands on certain businesses or industries, conflict preemption principles carry any less weight. Otherwise, state and local governments could circumvent federal objectives simply by limiting their conflict-preempted regulations to certain businesses or industries. Our conflict-preemption inquiry instead is focused on what the federal statute's purpose and intended effects are, and whether the state or local law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby*, 530 U.S. at 373 (quotation marks omitted). Section 18-913(1)(b) does so; it is conflict preempted.

laws does not mean it intended to allow those governments to en-act laws that conflict with Congress's decision to exempt casual hires or independent contractors from the employment verifica-tion process.

Next, the City's claim that the Club needs to show that the law is invalid in all circumstances misstates the law governing facial challenges. It is true that when a plaintiff raises a facial challenge to a statute, she generally "must establish that *no* set of circum-stances exists under which the [law] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987) (emphasis added). "[T]his rule, known as 'the *Salerno* rule,' has been subject to a heated debate in the Supreme Court, where it has not been consistently followed." *United States v. Frandsen*, 212 F.3d 1231, 1235 n.3 (11th Cir. 2000) (collecting cases from the Supreme Court). The City seems to in-terpret *Salerno* to require that the Club prove that there is no hy-pothetical situation in which the Ordinance could be validly ap-plied. Because the Club's performers are purportedly employees, and not independent contractors, under the IRCA, the City reasons that the Club's federal preemption claim fails.

We are not persuaded. Even applying *Salerno*'s no-set-of-circumstances test here, the question that *Salerno* requires us to answer is whether the statute fails the relevant constitutional test (in this case, the standard for federal conflict preemption discussed above). As the Tenth Circuit explained in *Doe v. City of Albuquer-que*, when it rejected a similar construction of the *Salerno* standard, "*Salerno* is correctly understood not as a separate test applicable to

facial challenges, but a description of the outcome of a facial challenge in which a statute fails to satisfy the appropriate constitutional framework." 667 F.3d 1111, 1123 (10th Cir. 2012); *see also United States v. Supreme Court*, 839 F.3d 888, 917 (10th Cir. 2016) (applying the same *Doe* construction of the *Salerno* standard to a facial federal preemption challenge). Here, the Ordinance fails the relevant constitutional test because, by requiring certain businesses to verify the employment eligibility of independent contractors and casual hires, it obstructs federal law. This provision of the law is facially invalid.

The larger problem with the City's application of *Salerno* is that its "approach would reject a conflict preemption claim in a facial challenge whenever a defendant can conjure up just one hypothetical factual scenario in which implementation of the state law would not directly interfere with federal law." *Lozano*, 724 F.3d at 313 n.22. States and municipalities could consistently sidestep facial challenges and the unambiguous command of federal law so long as they crafted some instance when the state or municipal law at issue aligned with federal objectives. *Lozano* says that can't be right, and we agree.

The City asserts that we should follow the Ninth Circuit's decision in *Puente Arizona v. Arpaio*, 821 F.3d 1098 (9th Cir. 2016), instead of *Lozano* and *Edmondson*, but we find the City's reliance on that decision to be misplaced. In *Puente Arizona*, the Ninth Circuit applied *Salerno* to a facial preemption challenge based on the IRCA. *Id.* at 1104. The state laws at issue prohibited using a false

identity to obtain employment. *Id.* at 1101. The court explained that the laws were "textually neutral -- that is, they apply to unauthorized aliens, authorized aliens, and U.S. citizens alike" -- so the law flunked *Salerno*'s no-set-of-circumstances test. *Id.* at 1104–05. In contrast, the Ordinance requires employment verification of both "performers" and "workers," so even if performers are "employees" under the IRCA, the Ordinance directly conflicts with Congress's choice not to require employers to verify the employment eligibility of independent contractors or casual hires. In any event, we find the reasoning in *Lozano* and *Edmondson* more persuasive.

We also find it suggestive that the Supreme Court declined to strictly adhere to *Salerno*'s rigorous facial challenge requirements in *Arizona*. The Court struck down an Arizona statute that empowered state officers to make warrantless arrests of individuals whom they had probable cause to believe were removable. 576 U.S. at 410. In doing so, the Court recognized that Congress had "put in place a system in which state officers may not make warrantless arrests of aliens based on possible removability *except in specific, limited circumstances.*" *Id.* (emphasis added). The Arizona law created "an obstacle to the full purposes and objectives of Congress" by "nonetheless authorizing state and local officers to engage in these enforcement activities *as a general matter.*" *Id.* (emphasis added). Even though *Arizona* recognized that the state law at issue sometimes aligned with federal law, the Court still

struck down the state law because it conflicted with federal law as a general matter.[7]

In sum, we conclude that Section 18-913(1)(b) is conflict preempted by the IRCA. And because Section 18-913(1)(b) is conflict preempted, we see no need to address the Club's remaining theories for express and conflict preemption.[8]

---

[7] The City also says that the Ordinance does not obstruct the objective of the IRCA because the Ordinance's chief purpose is to regulate human trafficking, not immigration. The City provides no persuasive legal support for the argument that its intent in enacting the Ordinance makes a difference in our conflict preemption analysis, apart from a distinguishable, out-of-circuit, district court opinion. *See Universal Contracting, LLC v. Utah Dep't of Com.*, 69 F. Supp. 3d 1225, 1242 (D. Utah 2014) (explaining that the plaintiff in the case could not establish that it had "ever formally or officially been treated as an employer of its member-owners under IRCA"). The City's intent in passing the Ordinance should not matter: Even if the City did not intend to regulate immigration law, the Ordinance still stands as an obstacle to one of the IRCA's objectives.

[8] As we discuss in Section VII, *infra*, the remedy for the Club's preemption challenge is severing Section 18-913(1)(b) from the rest of the Ordinance. By severing that Section, the Club's express preemption challenge to Sections 18-915(a) and 18-915(c) (the Ordinance's sections on civil penalties) does not matter because the Ordinance no longer regulates the "hir[ing], or [ ] recruit[ment] . . . for employment in the United States" an unauthorized alien. *See* 8 U.S.C. § 1324a(a)(1). In other words, we see no conflict (express, implied, or otherwise) between a municipal regulatory framework that requires a business to check a worker's identification before she enters to ensure that she is not a minor, and a federal law regulating the hiring of aliens.

20-14292          Opinion of the Court          47

## VI.

Finally, the Club appeals the district court's dismissal of its state law preemption claim, arguing that three state laws preempt the Ordinance's penalty scheme. We find no error in the district court's disposition of each of these state law preemption challenges.

State law preemption under Florida law mirrors the federal preemption framework. Just like federal preemption, Florida state law can expressly or impliedly preempt local ordinances. *Masone v. City of Aventura*, 147 So. 3d 492, 495 (Fla. 2014). Express preemption occurs when "a statutory provision stat[es] that a particular subject is preempted by state law or that local ordinances on a particular subject are precluded." *Id.* By contrast, "[i]mplied preemption is found where the state legislative scheme of regulation is pervasive and the local legislation would present the danger of conflict with that pervasive regulatory scheme." *Sarasota All. for Fair Elections, Inc. v. Browning*, 28 So. 3d 880, 886 (Fla. 2010). Even when "concurrent state and municipal regulation is permitted because the state has not preemptively occupied a regulatory field, 'a municipality's concurrent legislation must not conflict with state law.'" *City of Palm Bay v. Wells Fargo Bank, N.A.*, 114 So. 3d 924, 928 (Fla. 2013) (quoting *Thomas v. State*, 614 So. 2d 468, 470 (Fla. 1993)). Under state law, conflict preemption occurs when "the local enactment irreconcilably conflicts with or stands as an obstacle to the execution of the full purposes of the statute." *Id.* (quotation marks omitted). An example of conflict preemption at

the state level is when the municipality imposes a statutory penalty that exceeds a state law penalty for the same conduct. *See, e.g.*, *Thomas*, 614 So. 2d at 470 ("A city may not enact an ordinance imposing criminal penalties for conduct essentially identical to that which has been decriminalized by the state. Therefore, we find that the penalty imposed by the [challenged] ordinance is in conflict with state law.").

On appeal, the Club makes three arguments about its state law conflict preemption claim. The first two are that Sections 775.083(1) and 787.29 of the Florida Statutes preempt the Ordinance. Third, it claims that the district court abused its discretion by refusing to consider the Club's argument that Section 162.09 of the Florida Statutes preempts the fines imposed by the Ordinance. Had the district court properly considered its Section 162.09 argument, the Club says, the court would not have dismissed its conflict preemption claim.

First up is the Club's Section 775.083(1) conflict preemption argument. Section 775.083 sets out limits for penalties for criminal and noncriminal violations. Section 775.083(1)(e) provides:

> (1) A person who has been convicted of an offense other than a capital felony may be sentenced to pay a fine in addition to any punishment described in s. 775.082; when specifically authorized by statute, he or she may be sentenced to pay a fine in lieu of any punishment described in s. 775.082. A person who has been convicted of a noncriminal violation may be

sentenced to pay a fine. Fines for designated crimes
and for noncriminal violations shall not exceed:

. . .

(e): $500, when the conviction is of a misdemeanor of
the second degree or a noncriminal violation.

Fla. Stat. Ann. § 775.083(1)(e).

Although on its face, the statute limits "noncriminal viola-
tion[s]" to $500 in fines, the statutory definition of a "noncriminal
violation" creates an insurmountable hurdle for the Club's legal ar-
gument. The statute defines the term as:

any offense that is punishable under the laws of this
state . . . by no other penalty than a fine, forfeiture, or
other civil penalty. A noncriminal violation does not
constitute a crime, and conviction for a noncriminal
violation shall not give rise to any legal disability
based on a criminal offense. *The term "noncriminal
violation" shall not mean any conviction for any vio-
lation of any municipal or county ordinance. Noth-
ing contained in this code shall repeal or change the
penalty for a violation of any municipal or county or-
dinance.*

*Id.* § 775.08(3) (emphasis added). The plain meaning of "noncrim-
inal violation" specifically excludes municipal penalties -- the very
same type of penalties created by the Ordinance. As a result, we
see no conflict between Section 775.083(1)(e) and the Ordinance.
To put matters to rest, the Florida Supreme Court has also con-
cluded that under Section 775.08, a "violation of a municipal

ordinance . . . is not a 'noncriminal violation' as defined in Florida Statutes." *Thomas*, 614 So. 2d at 472. Because a violation of the Ordinance is not a "noncriminal violation," Section 775.083(1)(e) -- which creates a statutory ceiling on punishments for "noncriminal violation[s]" -- cannot preempt the Ordinance.

Second, the Club argues that Section 787.29, which requires in part that "strip club[s] or other adult entertainment establishment[s]" display human trafficking public awareness signs, preempts the Ordinance because its statutory penalty is limited to $500 under Section 775.083. *See also* FLA. STAT. ANN. § 787.29 (laying out the statutory penalties for criminal and noncriminal violations). The Club waived this argument by not lodging specific objections to the magistrate judge's reasoning in his R&R about the Club's Section 787.29 conflict preemption argument. *See* 11th Cir. R. 3-1 ("A party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation . . . waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions[.]").[9]

---

[9] Even if we considered the Club's argument, however, it still would fail. The Club says that the conduct regulated by the municipal ordinance and the statute need not be identical for preemption to apply, so long as both statutes are "directed at the same or less serious conduct." But the conduct regulated by each statute is not even similar: The Ordinance regulates who can perform or work at a nude dancing establishment to prevent human trafficking, while Section 787.29 regulates human-trafficking awareness signage outside of such establishments. The Ordinance is not directed at "less serious conduct" than

Third, the Club claims that the district court abused its discretion in ignoring the Club's argument that Section 162.09 preempts the Ordinance's penalty scheme. The Club says that a Florida appellate court's interpretation of Section 162.09 in *City of Miami Beach v. Nichols*, 314 So.3d 313 (Fla. 3rd DCA 2020), shows that Section 162.09 established a penalty maximum for a broad range of code enforcement matters,[10] so the City cannot pass an ordinance that exceeded those statutory caps. Because *Nichols*, in the first instance, was decided after the Club's briefing at the motion-to-dismiss stage and before the magistrate judge issued its R&R, the Club pleads that it had no other opportunity to apprise the district court of its argument. As a result, the district court's failure to consider the Club's argument was purportedly reversible error.

The problem with the argument is that district courts are afforded broad discretion when making these kinds of decisions. A "district court has discretion to decline to consider a party's argument when that argument was not first presented to the magistrate judge." *Williams v. McNeil*, 557 F.3d 1287, 1292 (11th Cir. 2009).

---

Section 787.29 because it directly attempts to prevent instances of human trafficking and underage girls from dancing nude.

[10] The statute caps fines for populous cities, including Miami Beach, at "$1,000 per day per violation for a first violation, $5,000 per day per violation for a repeat violation, and up to $15,000 per violation if the code enforcement board or special magistrate finds the violation to be irreparable or irreversible in nature." FLA. STAT. ANN. § 162.09(2)(d).

In *Williams v. McNeil*, we made clear that the district court retains "final adjudicative authority" in deciding whether to consider and evaluate new arguments that a party did not raise before the magistrate judge. *Id.* The district court in that case recognized that it had the discretion to consider a party's new argument, but it "declined to do so because [the party] failed to respond to the magistrate's order directing him to file a reply on the precise issue of timeliness." *Id.* Because the court recognized it had the discretion, and it declined to exercise that discretion based on a reasoned decision, we concluded that the district court had not committed reversible error. *See id.*

The district court did not abuse its discretion by declining to consider the Club's argument, even though *Nichols* was decided after the Club's briefing had been completed, because the Club had *never* previously argued that Section 162.09 preempted the Ordinance. The district court found this especially problematic because the litigation had been ongoing for three years, and the Club had likewise claimed that Section 775.083(1)(e) preempted the Ordinance for the same reasons that Section 162.09 allegedly preempted the Ordinance. In the district court's view, considering the new argument would have been unfair to the City and would have undermined the purpose of the magistrate system. We see no error in this analysis, let alone an abuse of discretion.

Because the Club could not identify a single statute that preempted the Ordinance's penalty structure, and because the district court did not abuse its discretion in ignoring the Club's

untimely Section 162.09 preemption argument, we affirm the dismissal of the Club's state preemption claim.

## VII.

The only provision of the Ordinance that we find unlawful is Section 18-913(1)(b). Our last task is to determine whether this provision is severable from the rest of the Ordinance.

"Severability of a local ordinance is a question of state law." *Coral Springs St. Sys. v. City of Sunrise*, 371 F.3d 1320, 1347 (11th Cir. 2004) (citing *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 772 (1988)). Florida law recognizes "the obligation of the judiciary to uphold the constitutionality of legislative enactments where it is possible to strike only the unconstitutional portions." *Ray v. Mortham*, 742 So. 2d 1276, 1280 (Fla. 1999). "Severability is not possible, however, when 'the taint of an illegal provision has infected the entire enactment, requiring the whole unit to fail.'" *Coral Springs*, 371 F.3d at 1347 (quoting *Schmitt v. State*, 590 So. 2d 404, 414 (Fla. 1991)).

We see no issue with severing Section 18-913(1)(b) from the rest of the Ordinance. That section is distinct from the rest of the Ordinance's commands because the Ordinance aims to accomplish goals separate from verifying an individual's employment authorization: preventing victims of human trafficking and minors from performing at strip clubs. Like the district court, we conclude Section 18-913(1)(b) is severable and strike it from the Ordinance.

★★★

The City passed a serious law to combat even more serious conduct. Not even the Club questions the legitimacy of the City's concerns about preventing human trafficking and stopping minors from dancing nude at strip clubs. But the Club raises serious federal and state law claims against the City's strategy of achieving those ends, and those challenges to the Ordinance -- despite the City's noble aims -- merit our careful review.

We hold that the City is entitled to summary judgment on the Club's First and Fourth Amendment challenges and dismissal of the Club's state law preemption claims. We also conclude that the Club is entitled to summary judgment on its federal conflict preemption claim.

In short, we affirm on all counts.

**AFFIRMED.**

20-14292         NEWSOM, J., Concurring         1

NEWSOM, Circuit Judge, concurring in part and concurring in the judgment:

I concur in the Court's judgment and join Parts I, II, III, VI, and VII of its opinion. I also join Part IV, save for its discussion of the "constitutional avoidance canon." For reasons I'll explain, although I agree with the Court's bottom-line conclusion regarding federal preemption, I arrive by a different route, and so do not join its Part V.

I

First, though, a few brief words about a Part of the Court's opinion I *do* join—and, in particular, aspects of the First Amendment doctrine that the opinion faithfully (and correctly) applies.

I begin in what may seem an odd place. I recently expressed the view that courts should assess Second Amendment challenges solely by reference to that provision's text and history, rather than through resort to amorphous means-ends balancing tests. *See United States v. Jimenez-Shilon*, 34 F.4th 1042, 1050–52 (11th Cir. 2022) (Newsom, J., concurring). At the same time, I lamented the fact that many other areas of constitutional law are so "choked" with judge-made doctrine "that one sometimes forgets what the constitutional *text* even says." *Id.* at 1053. Not long thereafter, the Supreme Court itself expressly embraced a text-and-history-only approach to Second Amendment cases and eschewed reliance on any sort of interest-balancing analysis. *See N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2126 (2022). Notably, in so doing,

the Court remarked that its approach "accord[ed] with how [it] protect[s] other constitutional rights"—including, it said, "the freedom of speech in the First Amendment." *Id.* at 2130.

That would be terrific—if, as I said in *Jimenez-Shilon*, deciding a First Amendment case consisted of "inquir[ing] what 'the freedom of speech' meant to the Founders and then ask[ing] whether the challenged law 'abridg[es]'—*i.e.*, 'lessen[s]' or 'diminish[es]'— that freedom." 34 F.4th at 1053 (Newsom, J., concurring) (some alterations in original) (quoting Noah Webster, *American Dictionary of the English Language* 4 (1st ed. 1828)). But at least for us middle managers serving on "inferior courts," U.S. Const. art. III, § 1, that's *not* the way it seems to work.

This case, it seems to me, is Exhibit A for the sort of "exhausting" doctrinal bloat that I described in *Jimenez-Shilon*. 34 F.4th at 1054 (Newsom, J., concurring). The Court's analysis of Club Madonna's First Amendment challenge spans some 16 pages. And not without justification. There's a lot of doctrine to slog through, and the Court does so methodically, carefully, and I think correctly. But again, there's just so much—so many standards, so many tests, so many factors. Speaking for myself, it can all begin to feel a little, well, made up. And if there is any fixed star in my own constitutional constellation, *cf. W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943), it's that unelected, unaccountable federal judges shouldn't make stuff up.

In *Jimenez-Shilon*, I surveyed the doctrinal landscape and counted at least five different balancing tests that the Supreme

20-14292              NEWSOM, J., Concurring                3

Court has fashioned for deciding free-speech cases of various stripes. *See* 34 F.4th at 1053–54 (Newsom, J., concurring). This case features a contest of sorts between two of them—both, almost comically, traveling under the "intermediate scrutiny" banner. As the Court here accurately explains, under one of those tests, traditionally used to assess the constitutionality of so-called "time, place, or manner" restrictions, a regulation is sufficiently "narrowly tailored" so long as the speech limitation it entails is "not substantially broader than necessary to achieve the government's interest." *Ward v. Rock Against Racism*, 491 U.S. 781, 798–800 (1989). Under the other, applicable "when 'speech' and 'nonspeech' elements are combined in the same course of conduct," a restriction may be "no greater than is essential to the furtherance" of an "important or substantial governmental interest." *United States v. O'Brien*, 391 U.S. 367, 376–77 (1968). Although those kissing cousins "embody much the same standards," *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566 (1991) (plurality op.), we have acknowledged that they are sufficiently different that the choice between them "may occasionally be outcome determinative," *Lady J. Lingerie, Inc. v. City of Jacksonville*, 176 F.3d 1358, 1365 (11th Cir. 1999).

Understandably, even the Supreme Court seems to get tripped up when trying to implement the dueling intermediate-scrutiny formulations. In *Members of City Council v. Taxpayers for Vincent*, 466 U.S. 789 (1984), for instance, the Court considered the constitutionality of a municipal ordinance that prohibited the posting of signs on public property. Given the subject matter, one

might have expected the Court to use the time-place-or-manner standard, but it instead applied—or at least purported to apply—the *O'Brien* test. In doing so, the Court recited *O'Brien*'s "no greater than is essential" language and said that the "critical inquir[y]" for tailoring purposes was "whether th[e] effect [on speech was] *no greater than necessary* to accomplish the City's purpose." *Id.* at 804–05. Then, though, only a few pages later—after analyzing the importance of the government's asserted interest—the Court "turn[ed] to the question whether the scope of the restriction on [the challengers'] expressive activity [was] *substantially broader than necessary* to protect" that interest. *Id.* at 808 (emphasis added). But that, as just explained, is the time-place-or-manner version of intermediate scrutiny, not the *O'Brien* version. In the doctrinal haze, the Court seems to have lost track of what it had just called the "critical inquir[y]."

It's bad enough that we have two different intermediate-scrutiny standards vying against one another, but to make matters worse, they are, to an extent, internally problematic. Most notable, of course, are the "judge-empowering" buzzphrases—"not substantially broader than necessary," "no greater than is essential," etc. *See Jimenez-Shilon*, 34 F.4th at 1054 (Newsom, J. concurring). And even within the individual strands, there seem to be fairly obvious incoherences. To take just one example, the Supreme Court has said that the *O'Brien* standard does *not* require (buzzphrase alert) a "least restrictive means analysis." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 301–02 (2000) (plurality op.); *see also Turner Broad.*

20-14292            Newsom, J., Concurring                    5

*Sys. v. FCC*, 512 U.S. 622, 662 (1994) ("To satisfy this [*O'Brien*] standard, a regulation need not be the least speech-restrictive means of advancing the Government's interests.").[1]  But as a matter of ordinary English, how is a standard that requires a restriction to be "*no greater than is essential* to the furtherance" of a government interest, *O'Brien*, 391 U.S. at 377 (emphasis added), *not* a least-restrictive-means requirement? I, for one, just don't get it. *Cf. Essential*, Webster's Second New International Dictionary 874 (1944) (defining "essential" to mean "[i]mportant in the highest degree; indispensable").

        To be clear, I don't think the Court here has misapprehended or misapplied First Amendment doctrine.  To the contrary, I think it has properly understood and applied it to correctly decide the free-speech issues in this case.  My concern is with the doctrine itself, which, with each passing day, seems increasingly made up—

---

[1] Our own precedent on this issue is (perhaps unsurprisingly) confused and confusing.  In *Daytona Grand, Inc. v. City of Daytona Beach*, for example, we said (seemingly following the Supreme Court's lead) that "*O'Brien* does not impose strict scrutiny's familiar 'least restrictive means' requirement."  490 F.3d 860, 885 (11th Cir. 2007).  But in decisions issued both before and after *Daytona*, we have said just the opposite. *See, e.g.*, *Sammy's Ltd. v. City of Mobile*, 140 F.3d 993, 996 (11th Cir. 1998) ("Under [*O'Brien*], an ordinance is constitutional if . . . there is no less restrictive alternative." (citing *O'Brien*, 391 U.S. at 377)); *Flanigan's Enters. v. Fulton County*, 596 F.3d 1265, 1277 (11th Cir. 2010) (similar).

in the utmost good faith, I have no doubt, but made up nonetheless. Here's hoping for a return to first principles.

## II

On, then, to the more conventional piece of the concurrence. I agree with the Court that the City's Ordinance is preempted by federal law—in particular, the federal Immigration Reform and Control Act of 1986 (IRCA), *see* 8 U.S.C. § 1324a. The district court held, and the Court today agrees, that the Ordinance is *conflict* preempted. I would hold, instead, that the Ordinance is *expressly* preempted. Here's why.

As the Court accurately summarizes, federal law can preempt state or local law under any of three different sub-doctrines: (1) "express" preemption; (2) "conflict" preemption; and (3) "field" preemption. *See* Maj. Op. at 36. There's no argument here about field preemption, so the remaining contenders are express and conflict preemption. As its label implies, express preemption applies when "'the text of a federal statute explicitly manifests Congress's intent to displace state law." *United States v. Alabama*, 691 F.3d 1269, 1281 (11th Cir. 2012). Conflict preemption is slipperier. It can occur *either* when "it is impossible for a private party to comply with both state and federal law" *or*, separately, when a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000) (quotation omitted). No one here suggests that it would be literally "impossible" to comply with both the Ordinance and IRCA, so, by

process of elimination, the brand of conflict preemption that the majority is applying must be "obstacle" preemption. *See* Maj. Op. at 37–46.

I'm less confident than the majority in obstacle preemption—both generally, as a sub-sub-doctrine, *cf. Wyeth v. Levine*, 555 U.S. 555, 594–604 (Thomas, J., concurring in the judgment), and more particularly, as it applies here. Discerning whether obstacle preemption exists is a notoriously unpredictable enterprise. What counts as "a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby*, 530 U.S. at 373. In assessing obstacle preemption, reviewing courts rely not just (or even primarily) on the text of duly enacted federal statutes, but on "legislative history, broad atextual notions of congressional purposes, and even congressional inaction." *Wyeth*, 555 U.S. at 594 (Thomas, J., concurring in the judgment); *see also* Maj. Op. at 38–39 (reviewing "the federal statute," the "regulatory framework," and "legislative history" to determine whether obstacle preemption applies).

Despite my lingering uncertainty, I recognize, of course, that obstacle preemption is a thing. And I recognize, as the Court notes, that both the Third and Tenth Circuits have held that IRCA conflict-preempts state and local laws requiring businesses to verify independent contractors' work eligibility. *See* Maj. Op. at 40–42. In *Lozano v. City of Hazleton*, for instance, the Third Circuit held that "[i]n striking the intricate balance that [led] to the enactment

of IRCA, Congress deliberately excluded independent contractors and other non-employees from the scope of the restrictions contained in the statute." 724 F.3d 297, 306 (3d Cir. 2013). In the same way, the Tenth Circuit concluded in *Chamber of Commerce v. Edmonson* that Congress "intentionally excluded independent contractors from verification obligations." 594 F.3d 767, 769 (10th Cir. 2010). I'm less confident than the Court, though, that the state and local laws at issue in *Lozano* and *Edmonson*—and thus the Third and Tenth Circuits' decisions in those cases—are "comparable" to ours. Maj. Op. at 40.

Even assuming that those courts were correct to conclude that applying work-eligibility requirements to employees but not independent contractors was an important part of IRCA's underlying purpose, the question remains whether Miami Beach's Ordinance counts as a "sufficient obstacle" to that purpose, *Crosby*, 530 U.S. at 373. And in at least one important respect bearing on that question, the Ordinance is different from the laws that the Third and Tenth Circuits considered. Unlike those laws, the Ordinance doesn't require *all* businesses to verify the work-eligibility of independent contractors; rather, it applies only to "nude dance establishments"—and, effectively, only to one such establishment, Club Madonna. It's not self-evident, to me anyway, that enforcement of a targeted municipal ordinance, whose object is to combat human trafficking rather than to prevent the employment of illegal aliens, would so frustrate IRCA's purposes as to trigger so-called obstacle preemption. And that is doubly so if we assume, as I think is

reasonable, that combatting human trafficking is among the "historic police powers of the States." *Wyeth*, 555 U.S. at 565 (emphasizing that courts should "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress" (quotation omitted)).

All of which is simply to say that while I'm by no means certain that the Court's assessment of conflict preemption is wrong, I'm dubious. Even so, I too believe that the Ordinance is preempted by federal law—expressly so. IRCA contains the following preemption provision, in which is embedded a parenthetical savings clause: "The provisions of this section preempt any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens." 8 U.S.C. § 1324a(h)(2). It seems to me clear enough that the Ordinance is a "local law imposing civil or criminal sanctions . . . upon those who employ . . . unauthorized aliens" within the meaning of that provision. The Ordinance, recall, requires all "nude dance establishments" to verify that every "worker or performer" is "either a U.S. Citizen, legal resident, or otherwise legally permitted to be employed within" the United States. Code of the City of Miami Beach § 18-913. It states that "[n]o person shall be allowed to enter or perform"—and thus to work in any capacity—"at the nude dance establishment . . . who has not been [so] verified." *Id.* And

it imposes graduated civil fines and penalties—in IRCA's terms, "sanctions"—for violations of its requirements. *See id.* § 18-915.

The pivotal question for express-preemption purposes, then, is whether the Ordinance qualifies as a "licensing [or] similar law[]" within the meaning of the preemption provision's savings clause. For the following reasons, I don't think it does.

In *Chamber of Commerce v. Whiting*, the Supreme Court rejected a preemption challenge to an Arizona statute that penalized businesses that employed unauthorized aliens—but only after concluding that the state law was a "licensing . . . law[]" under IRCA's savings clause. 563 U.S. 582, 611 (2011). IRCA, the Court noted, "preserved state authority over a particular category of sanctions—those imposed 'through licensing and similar laws.'" *Id.* at 607 (plurality op.) (quoting 8 U.S.C. § 1324a(h)(2)). The Court carefully considered the definition of the word "license" and, correlatively, what counted as a licensing law: "A license is 'a right or permission granted in accordance with law . . . to engage in some business or occupation, to do some act . . . which but for such license would be unlawful.'" *Id.* at 595 (majority op.) (first alteration in original) (quoting Webster's Third International Dictionary 1304 (2002)). The Court specifically considered whether laws regulating "articles of incorporation . . . and the like," or revoking licenses, counted as "licensing or similar laws" and concluded that they did. *Id.* at 596. Because Arizona's law "impose[d] sanctions through licensing laws"—in particular, it authorized "state courts to suspend

20-14292                NEWSOM, J., Concurring                11

or revoke an employer's business licenses"—it fell within IRCA's savings clause. *Id.* at 595, 599.

What, then, of the Miami Beach Ordinance? To begin with the obvious, its subject matter isn't the granting or revocation of business licenses—it's ID verification and recordkeeping to combat human trafficking. Moreover, the Ordinance's primary enforcement mechanism is a system of graduated monetary penalties. Section 18-915(a) is titled "Civil fine for violators" and imposes a series of escalating fines for first, second, and third offenses. True, § 18-915(c) provides for "enhanced penalties" that bear some resemblance to licensing restrictions—a three-month closure of any club found to have offended twice within three years, and a one-year revocation of a club's "business tax receipt" or "certificate of use" for a third offense. But I don't think that those enhanced penalties transform the Ordinance *as a whole* into a "licensing or similar law[]" such that its civil fines count as sanctions "impos[ed] . . . through licensing [or] similar laws" for purposes of IRCA's savings clause. 8 U.S.C. § 1324a(h)(2). Given the care with which the Supreme Court defined "licenses" and "licensing laws" in *Whiting*, it seems to me hard to imagine that a state could impose any penalty it wanted on employers of unauthorized aliens so long as its law *also* had some potential to affect businesses' licenses. Could a state, for instance, pass a statute imposing 10-year prison sentences for business owners who employ unauthorized aliens so long as the law also revoked the owners' business licenses? Surely not.

12                    Newsom, J., Concurring                    20-14504

I would hold, therefore, that the Miami Beach Ordinance is expressly preempted by IRCA on the ground that it *is* a "local law imposing civil or criminal sanctions . . . upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens" within the meaning of 8 U.S.C. § 1324a(h)(2), and *is not* a "licensing [or] similar law[]" within the meaning of that provision's savings clause.