[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-10801

_____

WACKO'S TOO, INC.,
a Florida, corporation d.b.a. Wackos,
MHHS-SINSATIONS, LLC,
a Florida limited liability company d.b.a. Sinsations,
PATMILT, INC.,
a Florida corporation d.b.a. Passions,
BARE ASSETS, INC.,
a Florida corporation,
EMPERORS, INC.,
a Florida corporation d.b.a. Emperor's, et al.,

Plaintiffs-Appellants,

NEVA CLINKSCALE, et al.,

Plaintiffs,

*versus*

CITY OF JACKSONVILLE,
a Florida municipal corporation,

                                                    Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 3:22-cv-00798-TJC-MCR

_____

_____

No. 23-11273

_____

EMPERORS, INC.,
a Florida corporation,
d.b.a. Emperor's Gentleman's Club,
SES JAX, LLC,
a Florida limited liability company,
d.b.a. Flashdancers,

                                                    Plaintiffs-Appellants,

STEPHANIE MEDINA, et al.,

                                                    Plaintiffs,

*versus*

23-10801                Opinion of the Court                3

CITY OF JACKSONVILLE,
a Florida municipal corporation,
SHERIFF, DUVAL COUNTY,

                                                Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 3:19-cv-01110-TJC-MCR

_____

_____

No. 23-11274

_____

WACKO'S TOO, INC.,
a Florida corporation,
d.b.a. Wacko's,
MHHS-SINSATIONS, LLC,
a Florida limited liability company,
d.b.a. Sinsations,
PATMILT, INC.,
a Florida corporation,
d.b.a. Passions,
BARE ASSETS, INC.,
a Florida corporation,

4                    Opinion of the Court                    23-10801

ESFUND, INC.,
a Florida corporation,
d.b.a. Gold Rush,
et al.,

                                              Plaintiffs-Appellants,

BIG B RANCH, INC.,
a Florida corporation,
d.b.a. Cocktails Showbar and Lounge,
et al.,

                                                        Plaintiffs,

*versus*

CITY OF JACKSONVILLE,
a Florida municipal corporation,
SHERIFF OF DUVAL COUNTY, FLORIDA,
N. O. ARCHBOLD,
in her individual capacity,

                                              Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 3:20-cv-00303-TJC-MCR

_____

Before ROSENBAUM, NEWSOM, and ABUDU, Circuit Judges.

NEWSOM, Circuit Judge:

We must decide whether a Jacksonville ordinance that effectively prohibits erotic dancers under the age of 21 from performing in adult-entertainment establishments violates the First Amendment, and relatedly, whether the ordinance's licensing scheme applicable to older dancers imposes an unconstitutional prior restraint. After careful consideration, and with the benefit of oral argument, we hold (1) that the ordinance's age restriction must be treated as a content-neutral regulation of expressive activity and is thus subject to intermediate scrutiny, which it survives, and (2) that the ordinance's licensing scheme embodies sufficient procedural protections to save it from invalidation as a prior restraint. Accordingly, we affirm the district court's decision.

## I

### A

The appellants here—Wacko's Too, Sinsations, Bare Assets, Passions, Emperors, and Flashdancers, along with individual erotic dancers—own, operate, or perform in adult-entertainment establishments (i.e., strip clubs or bikini bars) in Jacksonville, Florida. At some point, each of the appellant businesses has employed one or more erotic dancers under the age of 21. So, unsurprisingly, the appellants were none too pleased when Jacksonville enacted an ordinance requiring erotic dancers to obtain Work Identification Cards—which, significantly, the measure makes unavailable to anyone who isn't yet 21. The upshot, then, is that the ordinance

effectively prohibits any erotic dancer younger than 21 from performing in any adult-entertainment establishment in the city.

Separately, for aspiring dancers who have turned 21, the ordinance prescribes a process for obtaining a license. First, a performer must submit to the sheriff an application form on which she provides details about her physical appearance, contact information, and work history, along with an attestation that she hasn't been convicted of certain crimes. *See* Jacksonville, Fla., Ordinance 2022-172-E at 3 (Apr. 26, 2022). The applicant must also complete a free sex-trafficking education program. *See id*. at 3–4. Once the sheriff receives a dancer's application, he has 14 days to verify her information and then either approve or deny her license request. *See id*. at 5. The ordinance permits the applicant to continue to dance while her application is with the sheriff, and if he fails to act within the prescribed 14-day window, "the application shall be deemed granted." *Id*. at 5–6. If the sheriff denies a dancer's application, she "may request emergency injunctive relief" from a state court, but she may not dance while her petition for judicial review is pending. *Id*. at 7.

The ordinance's express purpose—as declared in its first section—is to "reduc[e the] criminal activities" occurring in and around adult-entertainment establishments:

> The intent of this legislation is to enact a scheme of uniform and non-discriminatory time, place and manner regulations for performers at adult entertainment establishments and dancing entertainment establishments in the City. It is the Council's intent that

> these regulations be interpreted and applied to not eliminate all forms of adult entertainment, but instead, to be narrowly tailored and limited to assist in reducing criminal activities occurring at these facilities.

*Id.* In support of its stated "intent," the city council cited statistics linking strip clubs to sex trafficking, in particular—and, even more particularly, to the trafficking of minors. So, for instance, the ordinance's recitals emphasize that "victims of sex trafficking are frequently recruited to work as performers or employees in strip clubs," that "persons under the age of twenty-one are more likely to [] remain within and dependent on the community in which they were raised," and that "research studies have identified the average age of which a person in the United States enters the sex trade for the first time is age seventeen." Jacksonville, Fla., Ordinance 2020-74-E at 3–4 (Feb. 25, 2020).

**B**

The appellants filed three lawsuits challenging two successive iterations of Jacksonville's ordinance—the original version, enacted in 2020, and an amended version, enacted in 2022. Happily, none of that procedural complexity is particularly important for present purposes.[1] All that really matters here is that both versions

---

[1] For the truly curious, here's the short version: Soon after the district court issued its decision resolving the first two suits, in which it invalidated various aspects of the 2020 ordinance but reserved ruling on other issues—including, importantly, the age restriction's constitutionality—the city council attempted

of the ordinance, and all three suits, presented the same basic issues—most notably (1) whether the ordinance's de facto prohibition on erotic dancers younger than 21 violates the First Amendment and (2) whether the ordinance's licensing regime for older dancers imposes an unconstitutional prior restraint.

The district court upheld both the ordinance's age restriction and its licensing scheme. With respect to the former, the court concluded that the restriction is a content-neutral speech regulation, as it is aimed not at any particular message underlying the dancers' expression but, rather, at attempting to "curtail the negative secondary effects of having vulnerable eighteen to twenty year-old performers exposed to human and sex trafficking." Doc. 32 at 12. The court held that the age restriction survived intermediate scrutiny because it furthers the City's "substantial" interest in combatting human trafficking and is appropriately tailored to achieving that interest.[2]

---

to cure the identified deficiencies in a substantially revised 2022 ordinance. Because the district court hadn't yet ruled on the age restriction, the 2022 version contained the same de facto prohibition on erotic performers under the age of 21. The enactment of the revised ordinance prompted a third lawsuit that was consolidated with the first two. Following a bench trial, the district court entered an order resolving the remaining issues in all three cases.

[2] The district court held that certain triggering language in the amended ordinance's age-restriction provision—which the city council had added in an effort to delay implementation while the court considered its validity—was unconstitutionally vague because it failed to provide fair notice about when the age restriction would take effect. Even so, the court proceeded to decide the

23-10801                 Opinion of the Court                          9

The district court separately rejected the appellants' contention that the licensing scheme applicable to dancers 21 and older effects an unconstitutional prior restraint. In particular, the court held that the 14-day period the ordinance gives the sheriff to approve or deny a license application is reasonable because it (1) prevents the indefinite suppression of expressive conduct (2) is shorter than periods that courts have previously sanctioned. The district court further concluded that the licensing scheme adequately preserves the status quo by allowing an applicant to continue to dance while the sheriff considers her application.

Before us, the appellants contend that the district court was wrong on both counts: They insist (1) that the ordinance's age restriction is a content-based speech restriction that is subject to and fails strict scrutiny and (2) that the ordinance's licensing scheme imposes an unconstitutional prior restraint and lacks the necessary procedural protections. Both issues presented on appeal are questions of law, which we review de novo. *Schultz v. Alabama*, 42 F.4th 1298, 1311 (11th Cir. 2022); *BellSouth Telecommunications, Inc. v. Town of Palm Beach*, 252 F.3d 1169, 1176 (11th Cir. 2001).[3]

---

constitutionality of the original age restriction, reasoning that "mootness does not occur if there is a substantial likelihood a challenged provision will be re-enacted" and noting that the parties agreed that the issue remained live. As predicted, the city readopted the age restriction immediately following the district court's order.

[3] One bit of housekeeping: Citing the Fifth Circuit's decision in *DC Operating, LLC v. Paxton*, 100 F.4th 657 (5th Cir. 2024), the City has suggested that this

## II

We'll begin by considering whether the ordinance's age restriction—which, again, effectively prohibits erotic dancers under the age of 21 from performing in adult-entertainment establishments—violates the First Amendment. We'll then explore whether the ordinance's licensing scheme imposes an unconstitutional prior restraint.[4]

---

case might be moot. We disagree. The suit in *DC Operating* was brought by the owner of a strip club in El Paso and two of its dancers, both of whom were under 21 when the complaint was filed. By the time the case reached the Fifth Circuit, the dancers had turned 21 and were thus no longer subject to the age restriction they were challenging. The court held that the case was moot as to them, and that the owner hadn't alleged an injury separate and apart from those asserted by the dancers. *Id.* at 658. Specifically, the court emphasized that the owner hadn't argued that the law burdened its own constitutional rights or that the dancers' age played a role in any message it was trying to convey. *Id.* Accordingly, the court concluded, the owner had no distinct legal interest in the case's resolution and thus lacked standing to appeal. *Id.*

Our case is different. The clubs here *did* allege that they suffered their own constitutional injuries. The complaint asserted, for instance, that "Emperors and Flashdancers have suffered economic injuries as a result of the . . . raids on their businesses, the arrest and forcible removal of their performers and the lingering effects the arrest have had on their ability to attract and retain performers." Doc. 1 at ¶ 93. So too, the clubs detailed the message that they sought to convey and emphasized the importance of erotic dancing in communicating that message. *See id.* ¶ 17. Accordingly, the justiciability issues that plagued *DC Operating* aren't implicated here.

[4] The appellants initially contended that the ordinance was preempted by a Florida statute that permitted 17-year-olds who weren't in school to work for certain licensed vendors, *see* Br. of Appellants at 48–50 (citing Fla. Stat.

## A

The First Amendment, which applies to state and local governments by dint of the Fourteenth, prohibits the enactment of laws "abridging the freedom of speech." U.S. Const., amend. I. Importantly for our purposes, the Supreme Court has held that the First Amendment protects expressive conduct—and, as particularly relevant here, that "nude dancing . . . is expressive conduct," although the Court has emphasized that "it falls only within the outer ambit of the First Amendment's protection." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 289 (2000).

## 1

To assess the age restriction's constitutionality, we must first determine what level of constitutional scrutiny to apply. And to do that, we must determine whether the restriction is "content-based" or "content-neutral." As the Supreme Court has recently explained, a law is content-*based* either (1) if it applies on its face "'to particular speech because of the topic discussed or the idea or message expressed'" or (2) if, though facially neutral, it "'cannot be "justified without reference to the content of the regulated speech"' or was 'adopted by the government "because of disagreement with the message the speech conveys."'" *TikTok Inc. v.*

---

§ 562.13), but that challenge is now moot in light of the statute's amendment to expressly "prohibit[] the employment of persons younger than 21 years of age in adult entertainment establishments." 2024 Fla. Sess. Law Serv. Ch. 2024-184 (West). Perhaps not surprisingly, the appellants haven't contended that the amended statute entitles them to any relief.

*Garland*, 145 S. Ct. 57, 67 (2025) (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 163–64 (2015)).  Content-based laws are subject to strict scrutiny, meaning that they "'are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.'" *Id.* (quoting *Reed*, 576 U.S. at 163).

By contrast, a content-*neutral* restriction is one that is "justified without reference to the content of the regulated speech." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (citation and quotation marks omitted).  "Content-neutral laws . . . 'are subject to an intermediate level of scrutiny because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue.'" *TikTok*, 145 S. Ct. at 67 (quoting *Turner Broadcasting System, Inc. v. FCC*, 512 U.S. 622, 641 (1994)).  In broad brushstrokes, a court applying intermediate scrutiny "will sustain a content-neutral law 'if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests.'"  *Id.* (quoting *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180, 189, (1997)).[5]

---

[5] We say "[i]n broad brushstrokes" because, in fact, the Supreme Court has deployed ever-so-slightly different "intermediate scrutiny" standards in different contexts. *See Club Madonna, Inc. v. City of Miami Beach*, 42 F.4th 1231, 1261–63 (11th Cir. 2022) (Newsom, J., concurring in part and concurring in the judgment).

As already noted, the district court here held that the ordinance's age restriction is content-neutral because, the court said, it "does not aim at the suppression of free speech," but rather "aims to curtail the negative secondary effects of having vulnerable eighteen to twenty year-old performers exposed to human and sex trafficking." Doc. 32 at 12. In so holding, the district court invoked *City of Renton v. Playtime Theatres,* 475 U.S. 41 (1986), in which the Supreme Court upheld a local zoning law that limited the areas in which adult theaters could operate. As the Court later explained its decision in *Renton,* although the regulation there "applied only to a particular category of speech, its justification had nothing to do with that speech," but rather was "aimed at the '*secondary effects* of [adult] theaters in the surrounding community'"—crime, declining property values, etc. *Boos v. Barry*, 485 U.S. 312, 320 (1988) (quoting *Renton*, 475 U.S. at 46). The district court here also cited, among others, our decision in *Zibtluda, LLC v. Gwinnett County*, in which we observed that "[t]he Supreme Court has made clear that when the purpose of an adult entertainment ordinance is to ameliorate the secondary effects of adult businesses, intermediate scrutiny applies." 411 F.3d 1278, 1284 (11th Cir. 2005).

Having concluded that the age restriction is content-neutral, the district court applied intermediate scrutiny—specifically, the variation of that standard set out in *United States v. O'Brien,* 391 U.S. 367 (1968). There, the Supreme Court held that a law will survive First Amendment scrutiny

> [1] if it is within the constitutional power of the Government; [2] if it furthers an important or substantial

governmental interest; [3] if the governmental inter-
est is unrelated to the suppression of free expression;
and [4] if the incidental restriction on alleged First
Amendment freedoms is no greater than is essential
to the furtherance of that interest.

*Id.* at 376–77. Applying *O'Brien*, the district court reasoned that the
ordinance's age restriction "furthers the City's substantial govern-
ment interest in combatting human trafficking and is appropriately
tailored" to achieving that interest. Doc. 32 at 30.

Before us, the appellants argue that the age restriction is con-
tent-*based* and therefore subject to strict scrutiny. And, they con-
tend, the ordinance can't survive strict scrutiny because even
though preventing human trafficking is unquestionably a compel-
ling government interest, the age restriction isn't narrowly tai-
lored. In particular, they say, it is fatally underinclusive in that it
fails to protect 18-to-20-year-old non-dancer strip-club employees
like servers and hostesses, who, according to the City's own evi-
dence, are also at risk of being trafficked.

To be sure, the ordinance's age restriction *feels* content-
based. Conspicuously, it doesn't apply to all 18-to-20-year-old per-
formers, or even all dancers; rather, it applies only to those engag-
ing in a particular type of expressive conduct—namely, "erotic"
dance (as opposed to, say, jazz, ballet, or tap). But as the district
court observed, we held in *Zibtluda* "that when the purpose of an
adult entertainment ordinance is to ameliorate the secondary ef-
fects of adult businesses, intermediate scrutiny applies." 411 F.3d

at 1284. In so holding, we explained that "although these ordinances are not strictly content-neutral, they are simply *treated as such*." *Id.* at 1285 (emphasis added). Indeed, we candidly acknowledged that restrictions of the sort at issue here are, in substance, content-based: "These regulations define the regulated conduct by its expressive content, and, to this extent, they are 'content-based.'" *Id.* (quoting *Fly Fish, Inc. v. City of Cocoa Beach*, 337 F.3d 1301, 1306 (11th Cir. 2003)). Even so, we explained that when a restriction's purpose is to combat the "secondary effects" associated with adult businesses, then "[a]lthough content-based, such a regulation will be *treated as if* it were content-neutral if it serves a substantial government purpose that is unrelated to the suppression of the expressive conduct." *Id.* (emphasis added) (citation and quotation marks omitted); *accord, e.g.*, *Artistic Entertainment, Inc. v. City of Warner Robins*, 223 F.3d 1306, 1308–09 (11th Cir. 2000) ("Limiting the ordinance's reach to those venues [*i.e.*, adult-entertainment establishments] reasonably perceived to pose a risk of creating such side effects does not turn the ordinance into a content-based restriction.").

Pointing to the Supreme Court's intervening decision in *Reed v. Town of Gilbert*, 576 U.S. 155 (2015), the appellants contend that a court may not recategorize a facially content-based restriction as content-neutral simply because its underlying purpose—here, to combat secondary effects like human trafficking—is unrelated to the expression's message. In *Reed*, the Court explained that "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive,

content-neutral justification, or lack of animus toward the ideas contained in the regulated speech." 576 U.S. at 165 (citation and quotation marks omitted). "In other words," the Court continued, "an innocuous justification cannot transform a facially content-based law into one that is content neutral." *Id.* at 166.

The appellants have a point. *Reed* is indeed quite clear that good intentions can't magically transform a facially content-based speech restriction into a content-neutral one. But here's the rub: As the district court noted, in the pre-*Reed* years, we clearly and repeatedly held—and in cases specifically involving adult-entertainment establishments—that "regulations that target undesirable secondary effects of protected expression are deemed content-neutral, and courts review them with an intermediate level of scrutiny," *Artistic Entertainment*, 223 F.3d at 1308–09, and that "when the purpose of an adult entertainment ordinance is to ameliorate secondary effects of adult businesses, intermediate scrutiny applies," *Zibtluda*, 411 F.3d at 1284. And under our precedent about precedent, "a prior panel's holding is binding on all subsequent panels unless and until it is overruled or undermined to the point of abrogation by the Supreme Court or by this court sitting *en banc*." *United States v. Archer*, 531 F.3d 1347, 1352 (11th Cir. 2008) (citation omitted). Needless to say, "an intervening decision of the Supreme Court can overrule the decision of a prior panel of our court"—but to do so, the Supreme Court's decision "must be clearly on point." *Id.* (citation and quotation omitted).

The question, then, is whether the Supreme Court's "intervening decision" in *Reed* is sufficiently "on point" to have overruled or abrogated *Artistic Entertainment* and *Zibtluda*. Although a close call, we conclude that it isn't. First, *Reed* had nothing to do with adult-entertainment establishments—it involved a sign ordinance. And that matters because it means that the Supreme Court's decision there didn't have to account for the oft-repeated refrains that nude dancing and the like exist at "the outer perimeters of the First Amendment" but "only marginally so," *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 566 (1991) (plurality opinion), and "fall[] only within the outer ambit of the First Amendment's protection," *City of Erie*, 529 U.S. at 289. Second, and relatedly—and perhaps not surprisingly given the case's subject matter—*Reed* never mentions, or even adverts to, the "secondary effects" doctrine, which has primarily (albeit not exclusively) arisen in the adult-entertainment context. These, we think, are meaningful distinctions—too meaningful, in any event, to permit the conclusion that *Reed* "overruled or undermined to the point of abrogation" our preexisting precedent.

The Supreme Court's post-*Reed* decision in *City of Austin v. Reagan National Advertising*, 596 U.S. 61 (2022), likewise counsels caution. There, the Court rejected as too broad the suggestion that *Reed* means that "any classification that considers [the speech's] function or purpose is *always* content based." *Id.* at 74. In fact, in *City of Austin*—which, like *Reed*, also considered a sign ordinance outside the adult-entertainment context—the Court emphasized that such an interpretation "would contravene numerous

precedents . . . [that] *Reed* did not purport to cast doubt on." *Id.* at 74–75.

In declining to revisit our existing secondary-effects precedents in light of *Reed*, we are in good company. Several of our sister circuits have rejected similar entreaties. *See BBL, Inc. v. City of Angola*, 809 F.3d 317, 326 n.1 (7th Cir. 2015) ("We don't think *Reed* upends established doctrine for evaluating regulation of businesses that offer sexually explicit entertainment, a category the [Supreme] Court has said occupies the outer fringes of First Amendment protection."); *Free Speech Coal., Inc. v. U.S. Att'y Gen.*, 825 F.3d 149, 161 n.8 (3d Cir. 2016) ("[I]t is doubtful that *Reed* has overturned the *Renton* secondary effects doctrine."); *Association of Club Executives of Dallas, Inc. v. City of Dallas, Texas*, 83 F.4th 958, 964-65, 970 (5th Cir. 2023) ("Both *Reed* and *City of Austin* concerned physical signs and said nothing about [sexually-oriented businesses] or the secondary effects doctrine. The Court 'does not normally overturn . . . earlier authority *sub silentio*.' So, it would be a mistake to interpret those decisions as silently spelling *Renton*'s demise. To the contrary, *City of Austin* cautioned inferior courts against doing exactly that. More to the point, whether to overrule or modify *Renton* is the High Court's business, not ours. . . . To sum up, we hold that *Renton* remains good law and thus apply intermediate scrutiny to the Ordinance." (citations and footnote omitted)).[6]

---

[6] For what it's worth—not much, but still—our holding today also squares with our own unpublished decisions. *See, e.g.*, *Flanigan's Enterprises, Inc. of Ga.*

Accordingly, we find ourselves constrained to apply inter-mediate scrutiny to the ordinance's age restriction, per our on-point (and not-clearly-abrogated) decisions in *Artistic Entertainment* and *Zibtluda*.

**2**

So, content-based though it may be, we are bound to "treat" the ordinance's age restriction "as if" it were content-neutral, *Zibtluda*, 411 F.3d at 1284, and apply intermediate scrutiny pursu-ant to the standard established in *O'Brien*. *See Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1244 (11th Cir. 2022) (explaining that "[t]he *O'Brien* test is used to evaluate regulations of expressive conduct" (citation and quotation marks omitted)).

To repeat, in *O'Brien*, the Supreme Court held that a speech regulation is "sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction

*v. City of Sandy Springs*, 703 F. App'x 929, 935 (11th Cir. 2017) ("There is no question that *Reed* has called into question the reasoning undergirding the sec-ondary-effects doctrine. . . . But significantly, the majority opinion in *Reed* did not address the secondary-effects doctrine. For this reason alone, we cannot read *Reed* as abrogating either the Supreme Court's or this Circuit's secondary-effects precedents." (footnote omitted)); *Discotheque, Inc. v. Augusta-Richmond Cnty.*, No. 21-13218, 2022 WL 5077263, *6 (11th Cir. Oct. 5, 2022) ("*Reed* calls into question the reasoning undergirding the secondary-effects doctrine. . . . Because *Reed* did not address the secondary-effects doctrine, though, we can-not interpret it as abrogating either the Supreme Court's or this Circuit's sec-ondary-effects precedents.").

on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." *O'Brien*, 391 U.S. at 377. Or, as we recently paraphrased it, *O'Brien* instructs that a "law will be upheld if (1) [it] is grounded in a substantial governmental interest, and (2) the incidental restriction on speech is no broader than necessary to further that interest." *Club Madonna*, 42 F.4th at 1242.

The government's interest here—*i.e.*, combatting human trafficking—clearly constitutes a "substantial governmental interest." We recognized as much in *Club Madonna*, *see id.* at 1247, and the appellants don't contend otherwise. *See* Br. of Appellants at 45. The appellants do, though, contend (1) that the ordinance fails to "further[]" that important interest, *O'Brien*, 391 U.S. at 377, and (2) that, in any event, it is "broader than necessary" to advance that interest, *Club Madonna*, 42 F.4th at 1242.

We have said that the "further[ance]" requirement entails a "modest standard" and that the government's burden in satisfying it is "not . . . rigorous." *Zibtluda*, 411 F.3d at 1286 (citations and internal quotation marks omitted). In particular, we have held, the government "need only have a 'reasonable basis' . . . for believing that its policy will indeed further a legitimate interest," and that its "basis can consist of the experience of other cities, studies done in other cities, caselaw reciting findings on the issue, as well as the officials' own wisdom and common sense." *Id.* (citations and quotation marks omitted) (alteration in original). The lone prerequisite is that "the enacting body must cite to *some* meaningful indication—in the language of the code or in the record of legislative

proceedings—that the legislature's purpose in enacting the challenged [law] was a concern over secondary effects rather than merely opposition to proscribed expression." *Id*. (citation and quotation marks omitted).

The ordinance here satisfies that standard. It includes more than a dozen "whereas" clauses reciting data, statistics, and research demonstrating, for instance, (1) that Florida is a hotbed of sex-trafficking activity, (2) that strip clubs play a significant role in sex-trafficking networks, (3) that "victims of sex trafficking are frequently recruited to work as performers or employees in strip clubs," (4) that those under the age of 21 are at increased risk of becoming trafficking victims, and (5) that "sex trade at strip clubs is a common occurrence in Jacksonville." Jacksonville, Fla., Ordinance 2020-74-E at 3–4 (Feb. 25, 2020). And in the district court, the city attached documentation supporting its recitals, along with an affidavit from a city council member stating that she had personally relied on the empirical evidence in supporting the ordinance's enactment. Docs. 30-2, 30-1. Particularly because the "further[ance]" requirement is "not rigorous," the city's evidence is more than sufficient to constitute a "reasonable basis" for concluding that the ordinance will advance its interest in combatting sex trafficking. *Zibtluda*, 411 F.3d at 1286 (citations and quotation marks omitted).

Next up, tailoring: Under *O'Brien*, a content-neutral speech regulation can be "no greater than is essential to the furtherance of [the government's] interest." 391 U.S. at 377. The appellants

22                    Opinion of the Court                    23-10801

contend that the age restriction fails the tailoring requirement because it is underinclusive—specifically, in that it fails to cover *non*-dancer strip-club employees like servers and hostesses. According to the ordinance's own recitals and the city's own supporting evidence, the appellants say, non-dancer employees are also at risk of becoming sex-trafficking victims, and yet the ordinance doesn't protect them. The appellants may well be right as a matter of fact: The ordinance notes, for instance, that "victims of sex trafficking are frequently recruited to work as performers *or employees* in strip clubs," Jacksonville, Fla., Ordinance 2020-74-E at 3–5 (Feb. 25, 2020), and one of the reports on which the city relies states that sex-trafficking victims are often "recruited to work in strip clubs as *hostesses*, *servers*, or dancers," Doc. 30-7 at 52 (emphasis added).

But the appellants are wrong as a matter of law. Even when applying strict scrutiny, the Supreme Court has said that while underinclusiveness may "raise[] a red flag," the First Amendment "imposes no freestanding 'underinclusiveness limitation.'" *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 449 (2015) (quoting *R.A.V. v. St. Paul*, 505 U.S. 377, 387 (1992)). And that is doubly true with respect to laws, like the ordinance here, that are subject to *O'Brien*'s more lenient intermediate-scrutiny standard. By its terms, *O'Brien* requires only that restrictions be "no *greater* than is essential," 391 U.S. at 377 (emphasis added), or, as we have described *O'Brien*'s tailoring requirement, "no *broader* than necessary," *Club Madonna*, 42 F.4th at 1242 (emphasis added). Intermediate scrutiny, the Supreme Court recently reaffirmed, operates to identify and invalidate laws that "burden substantially *more* speech than necessary"—not less.

*TikTok*, 145 S. Ct. at 69 (emphasis added). Put simply, the intermediate-scrutiny standard aims to eliminate regulations that are over-inclusive, not underinclusive. So while the City clearly could have drafted the age restriction more broadly to reach non-dancer employees, its choice to legislate more narrowly isn't fatal: "[The government] need not address all aspects of a problem in one fell swoop; policymakers may focus on their most pressing concerns." *Williams-Yulee*, 575 U.S. at 449.

The ordinance's age restriction here may well be underinclusive, but it isn't overinclusive in the way that *O'Brien*-style intermediate scrutiny forbids.

★    ★    ★

In sum, bound as we are to "treat" the ordinance's facially content-based age restriction "as if" it were content-neutral and apply intermediate scrutiny, we hold that the restriction satisfies the standard articulated in *O'Brien*. Accordingly, we affirm the district court's decision that the age restriction does not violate the First Amendment.

**B**

The appellants separately argue that the licensing scheme applicable to older erotic dancers imposes an unconstitutional prior restraint and fails to satisfy either of two necessary ameliorating conditions: (1) It doesn't require the sheriff to render his decision concerning an aspiring dancer's license application within a reasonable time, and (2) it fails to preserve the status quo pending judicial

review of the sheriff's denial of an application.  For reasons we will explain, we reject both contentions.

The Supreme Court's decision in *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215 (1990), establishes the ground rules applicable here.  There, the Court held that a prior restraint arising out of a licensing regime is not unconstitutional provided that two procedural safeguards are observed:  (1) "[T]he licensor must make the decision whether to issue the license within a specified and reasonable time period during which the status quo is maintained"; and (2) "there must be the possibility of prompt judicial review in the event that the license is erroneously denied."  *Id.* at 228 (plurality opinion) (citing *Freedman v. State of Md.*, 380 U.S. 51, 59 (1965)).  The appellants here primarily emphasize the first safeguard.

**1**

The appellants first contend that the ordinance gives the sheriff too long to decide whether to approve or deny an aspiring dancer's application.  The ordinance requires the sheriff to render his decision within 14 days of receiving an application—after that, "the application shall be deemed granted."  It is undisputed that the ordinance "maintain[s]" the "status quo" while the sheriff considers an application—meaning that the applicant can continue to dance during that period—so the sole question is whether 14 days constitutes a "reasonable time period."  *Id*.  We hold that it does.

First, as a matter of law, we have previously deemed lengthier periods reasonable.  *See, e.g.*, *Café Erotica of Fla., Inc. v. St. Johns Cnty.*, 360 F.3d 1274, 1282–83 (11th Cir. 2004) (upholding a 30-day

period); *Redner v. Dean*, 29 F.3d 1495, 1500 (11th Cir. 1994) (upholding a 45-day period and agreeing with decisions approving much longer periods).    Second, as a matter of practice, it takes time for the sheriff to process each application and perform criminal-history checks.  And of course, processing erotic dancers' license applications is but a fraction of the day-to-day work the sheriff's office must perform.  Moreover, any burden that the 14-day period imposes is ameliorated by the fact that an applicant is permitted to perform while the sheriff considers her application.

In short, we hold that 14 days is not an unreasonable length of time to render a decision on a dancer's license application and thus does not independently present any constitutional concerns.

**2**

We must separately decide whether the licensing scheme complies with *FW/PBS*'s mandate that the "status quo" be "maintained" while a would-be speaker's application is under consideration.  The focus of the parties' dispute is the period as to which the status-quo-maintenance requirement attaches.  The city contends that *FW/PBS*'s status-quo requirement applies only during the initial period in which the sheriff is deciding whether to grant the license. *See* Br. of Appellee at 38.  The appellants, on the other hand, insist that the status-quo requirement extends further, to include "the gap period between the denial of an Identification Card by the Sheriff and the eventual ruling by a judge once the applicant files an appeal." Br. of Appellants at 52.  As already explained, the ordinance here permits a performer to continue to dance while the

sheriff considers her initial application, but that permission does not carry over to the period between the sheriff's denial and a court's review of his decision. *See* Jacksonville, Fla., Ordinance 2022-172-E at 7 (Apr. 26, 2022). The question, then, is whether the failure to maintain the status quo beyond the initial application-review period renders the ordinance invalid under *FW/PBS*.

It's a tricky question, in no small part because *FW/PBS* isn't exactly a model of clarity. In seeking to understand the rule emanating from that decision, we think it makes sense to rewind the tape and first examine its predecessor, *Freedman v. Maryland*, 380 U.S. 51 (1965). There, the Supreme Court considered a state statutory scheme that required film exhibitors to submit their movies to a state censorship board for preapproval. *Id.* at 54–55. The Court held that the First Amendment required the state to observe three "procedural safeguards." *Id.* at 58. "First, the burden of proving that the film is unprotected expression must rest on the censor." *Id.* "Second, while the State may require advance submission of all films, . . . the requirement cannot be administered in a manner which would lend an effect of finality to the censor's determination whether a film constitutes protected expression." *Id.* Importantly for our purposes, in connection with this second requirement, the Court held that "the exhibitor must be assured, by statute or authoritative judicial construction, that the censor will, within a specified brief period, either issue a license or go to court to restrain showing the film"—and, therefore, that "[a]ny restraint imposed in advance of a final judicial determination on the merits must similarly be limited to preservation of the status quo for the shortest

23-10801                Opinion of the Court                27

fixed period compatible with sound judicial resolution." *Id.* at 58–59. Finally, the Court said that "the procedure [for judicial review] must also assure a prompt final judicial decision." *Id.* at 59. The Court invalidated the statutory scheme, which it concluded did "not satisfy these criteria":

> First, once the censor disapproves the film, the exhibitor must assume the burden of instituting judicial proceedings and of persuading the courts that the film is protected expression. Second, once the [censor] has acted against a film, exhibition is prohibited pending judicial review, however protracted. . . . Third, it is abundantly clear that the [] statute provides no assurance of prompt judicial determination.

*Id.* at 59–60.

Fast-forward to *FW/PBS*, in which a fractured Court considered *Freedman*'s procedural requirements in relation to a city ordinance that, like the one here, established a licensing scheme that applied to "sexually oriented businesses." 493 U.S. at 220. Three Justices thought that *Freedman* applied only to true censorship schemes and was completely inapposite to content-neutral licensing regimes. *Id.* at 244 (White, J., joined by Rehnquist, C.J., dissenting in part); *id.* at 250 (Scalia, J., dissenting in part). Three others would have applied *Freedman* in its entirety to the city's licensing regime. *Id.* at 238 (Brennan, J., joined by Marshall & Blackmun, JJ., concurring in the judgment).

In a controlling plurality opinion, the remaining three Justices staked out a middle ground of sorts. They described *Freedman*'s three requirements as follows: "(1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court." *Id.* at 227 (O'Connor, J., joined by Stevens & Kennedy, JJ.). But they explained that unlike the scheme in *Freedman*, which "engaged in direct censorship of particular expressive material," the licensing regime before them examined only "the general qualifications of each license applicant, a ministerial action." *Id.* at 229. They thus concluded that the licensing scheme didn't "present the grave 'dangers of a censorship system'" and, therefore, that the "full procedural protections" of *Freedman* weren't necessary. *Id.* at 228 (quoting *Freedman*, 380 U.S. at 58). Rather, only what they called *Freedman*'s "core policy," comprising "the first two safeguards," applied: "[T]he licensor must make the decision whether to issue the license within a specified and reasonable time period during which the status quo is maintained, and there must be the possibility of prompt judicial review in the event that the license is erroneously denied." *Id.*

It requires some squinting, but as we understand it, *FW/PBS* sets out two slightly different standards, which apply in different circumstances, depending on whether a prior-restraint scheme risks "the grave 'dangers of a censorship system.'" *Id.* (quoting *Freedman*, 380 U.S. at 58). The first, more extensive version, which

can be read to require maintenance of a speech-protecting status quo "prior to judicial review," refers to the "procedural safeguards" that "were necessary to ensure expeditious decisionmaking by the motion picture censorship board"—that is, by an entity like the one in *Freedman*. *Id.* at 227. The second, more limited version—noticeably lacking the "prior to judicial review" language—refers to the "core policy underlying *Freedman*" and the "two safeguards" that applied to the licensing scheme at issue in *FW/PBS*. For three reasons, we conclude that the more modest "core policy" standard applies to the licensing scheme at issue in this case. *Id.* at 228.[7]

*First*, *Freedman* and *FW/PBS* indicate that the more robust prior-to-judicial-review standard is logically and logistically paired

---

[7] Much of the confusion surrounding *Freedman* and *FW/PBS* likely stems from the shifting (or at the very least ambiguous) usage of the term "status quo." In *Freedman*, "preservation of the status quo" pretty clearly referred to the *prevention* of a film's exhibition. There's really no other way to interpret the Court's statement that "[a]ny *restraint* imposed in advance of a final judicial determination on the merits must similarly *be limited to preservation of the status quo* for the shortest fixed period compatible with sound judicial resolution." *Freedman*, 380 U.S. at 59 (emphasis added). The plurality opinion in *FW/PBS* redescribed *Freedman* to require that "any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained." 493 U.S. at 227. It's not at all clear what the plurality meant by the phrase "the status quo must be maintained." If by "status quo" it meant *protection* of speech, it's unclear how that protection sensibly exists alongside a "restraint." *Id.* If instead the plurality meant the same thing as the Court in *Freedman*—that is, the maintenance of a *restriction*—then to say that the status quo "must be maintained" for the limited duration of a "restraint" is simply another way of saying that the restraint must be respected by the would-be speaker. *Id.* Neither reading is especially satisfying.

with a requirement that the government bring suit to enforce its speech restriction. In *Freedman*, the government could preserve the status quo—in the sense of issuing a "temporary restraint"—for a "specified brief period" long enough to put the issue before a court, which it would have to do in order to effect a longer-lasting prohibition. 380 U.S. at 59. Hence (again) *Freedman*'s second procedural safeguard: "[T]he exhibitor must be assured, by statute or authoritative judicial construction, that the censor will, within a specified brief period, either issue a license or go to court to restrain showing the film"—and, therefore, that "[a]ny restraint imposed in advance of a final judicial determination on the merits must similarly be limited to preservation of the status quo for the shortest fixed period compatible with sound judicial resolution." *Id*. at 58–59.

*FW/PBS* is different. The plurality's description there of the "essential" safeguards that apply to non-censorious licensing regimes clearly omits any requirement that the government bring suit to enforce its restriction. *See FW/PBS*, 493 U.S. at 228; *see also Dream Palace v. County of Maricopa*, 384 F.3d 990, 1009–10 (9th Cir. 2004) (noting that the requirement to place "the burden of instituting proceedings on the state does not apply to [non-censorious] licensing schemes" governing adult-entertainment establishments (quoting *Baby Tam & Co., Inc. v. City of Las Vegas*, 247 F.3d 1003, 1008 (9th Cir. 2001))); *Big Dipper Ent., L.L.C. v. City of Warren*, 641 F.3d 715, 721 (6th Cir. 2011) (rejecting the argument that it was the government's "burden . . . to file a lawsuit with respect to the denied application" of an adult-entertainment business). In the absence of any requirement that the government sue, it is thus

perhaps unsurprising that under the *FW/PBS* plurality's framework, the time period during which the status quo must be maintained lasts only until "the licensor . . . make[s] the decision whether to issue the license." *FW/PBS*, 493 U.S. at 228. Indeed, absent a government-suit requirement, it's unclear how necessitating preservation of the status quo pending judicial resolution would even work. Could the sheriff's license denial be enforced unless and until *the applicant* brought suit to challenge it, at which point things revert to the status quo, at least until the court weighs in? We think it far likelier that the enforcement-suit and status-quo-maintenance-pending-judicial-review requirements are linked, and that *FW/PBS* (if a little inarticulately) recognized as much.

*Second*, the Supreme Court's subsequent decision in *City of Littleton v. Z.J. Gifts D-4, L.L.C.*, 541 U.S. 774 (2004), is instructive. There, the Court upheld an adult-business licensing ordinance against a First Amendment challenge. *Id.* at 776. The issue was the required promptness of judicial review. The city first contended that while *Freedman* required "prompt final judicial decision" of challenges to censorship decisions, *FW/PBS* spoke only of the *"possibility of prompt judicial review"* of licensing decisions—meaning, the city said, only "speedy access to the courts, not . . . a speedy court decision." *Id.* at 780 (emphasis in original) (citations omitted). The Court rejected this argument as making "too much of too little": *FW/PBS* didn't mean to allow courts to put licensing-decision appeals on their dockets rapidly but let them linger there indefinitely. *Id.* at 780–81.

Even so, the Court upheld the ordinance because it agreed with the city's contention that the rapid timelines suggested in *Freedman* for judicial review and resolution of censorship decisions—a court hearing within one day and a decision not less than two days later—weren't necessary for licensing determinations. *Id.* at 781. The Court held that *FW/PBS* didn't extend "*Freedman*'s special judicial review rules" to the business-licensing context. *Id.* The Court then examined the relevant state judicial-review procedures and concluded that they were sufficiently speedy. *Id.* at 782–84.

*Littleton* is informative because it confirms what the plurality seemingly tried to make clear in *FW/PBS*—namely, that licensing laws that don't pose "dangers of a censorship system" aren't subject to all the requirements set out in *Freedman*. *FW/PBS*, 493 U.S. at 228 (quoting *Freedman*, 380 U.S. at 58). More particularly, *Littleton* indicates that an argument similar to the one the appellants make here—*i.e.*, that *FW/PBS* mechanically applies two of *Freedman*'s three requirements—oversimplifies things. *FW/PBS*'s requirements are *both* (1) obviously, fewer in number that *Freedman*'s *and* (2) less obviously, but just as surely, less restrictive in scope. In short, *Freedman*'s requirements apply to censorship regimes that are highly discretionary and pose a greater risk of content discrimination, while *FW/PBS* applies more lenient requirements to relatively objective licensing schemes like the one at issue in this case. And the ordinance here satisfies *FW/PBS*'s more modest test because, among other reasons, it allows aspiring dancers to continue to dance while the sheriff considers their applications.

*Finally*, our own precedents seem to assume (albeit without explicitly saying so) that it is sufficient for a licensing regime to protect a speaker's ability to express herself during an administrator's consideration of her application. In *Redner v. Dean*, we described *FW/PBS* as requiring "that [] expressive activity may only be restrained prior to judicial review for a specified brief time period in order to maintain the status quo." 29 F.3d 1495, 1500 (11th Cir. 1994). We held that a 45-day time limit on an administrator's decision to a grant a license for an adult entertainment facility was acceptably brief. *Id.* But the ordinance provided only that an applicant "*may* be permitted to begin operating the establishment" if the administrator failed to approve or deny the application within the 45-day timeframe. *Id.* at 1500–01 (citation omitted). This uncertain language unconstitutionally threatened "indefinite suppression of expressive activity." *Id.* at 1501.

We similarly invalidated an ordinance in *Lady J. Lingerie, Inc. v. City of Jacksonville* because it "fail[ed] to put any real time limits on the zoning board" to decide whether to permit an adult business in a desired location. 176 F.3d 1358, 1363 (11th Cir. 1999). We held that this rendered the ordinance unconstitutional despite its provision allowing "an applicant to begin operating its business 45 days after applying" if the zoning board had not decided otherwise. *Id.* It was little use for a business to be allowed to "operate in limbo, not knowing whether *the City* will shut it down the next day." *Id.* (emphasis added).

Both *Redner* and *Lady J.* demonstrate that government officials must issue licensing decisions within a brief, definite period—and can't simply blow past deadlines and then issue binding decisions as though they were timely. But they also seem to be predicated on the assumption that a timely government decision will be effective unless and until overturned through prompt judicial action. In other words, as *Lady J.* put it, the law requires "that the status quo be maintained while *public officials*"— not judges—"are deciding." *Id.* (emphasis added).

Accordingly, because the City's ordinance maintains the status quo—in the sense that it allows an aspiring performer to continue to dance—while the sheriff decides whether to issue a license, we conclude that it satisfies *FW/PBS*'s standard applicable to licensing schemes and therefore avoids any constitutional concerns.

★    ★    ★

In sum, we hold that the ordinance's 14-day period for making licensing determinations is reasonable and that the ordinance maintains the status quo during the relevant time period as required by *FW/PBS*. We therefore affirm the district court's conclusion that the ordinance's licensing scheme embodies sufficient procedural safeguards to save it from invalidation as a prior restraint.

## III

For the foregoing reasons, we hold (1) that the ordinance's age limitation must be treated as a content-neutral restriction on speech of would-be erotic dancers younger than 21, and that it survives intermediate scrutiny, and (2) that the licensing regime

23-10801                Opinion of the Court                35

satisfies the procedural safeguards necessary for constitutionally valid prior restraints.

**AFFIRMED**.

21-12314                NEWSOM, J., Concurring                1

NEWSOM, Circuit Judge, concurring:

Needless to say, I agree with the majority opinion's conclusion that this Court's decision in *Zibtluda, LLC v. Gwinnett County* requires us to "treat[]" the Jacksonville ordinance's facially content-based age restriction—which applies only to erotic dancers in adult-entertainment establishments—"as if" it were content-neutral, on the ground that the restriction's "purpose" is "to combat the negative secondary effects of adult businesses." 411 F.3d 1278, 1285 (11th Cir. 2005) (citation and quotation marks omitted). I also agree that the Supreme Court's intervening decision in *Reed v. Town of Gilbert*, 576 U.S. 155 (2015), isn't quite sufficiently on point to warrant casting *Zibtluda* aside. To be sure, the Court there held, in no uncertain terms, that "[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive." *Id*. at 165. But it did so in connection with a sign ordinance, not a strip club—and that's enough to dissuade me from walking away from existing circuit precedent.

That said, I'm skeptical. So long as the Supreme Court deems erotic dancing a form of expression protected by the First Amendment, it seems to me that *Reed*'s logic applies foursquare and casts serious doubt on the continuing vitality of the "secondary effects" doctrine traditionally associated with *City of Renton v. Playtime Theaters, Inc.*, 475 U.S. 41 (1986).

★   ★   ★

On its face, the age restriction here is indisputably content-based. After all, the ordinance effectively prohibits those under the

age of 21 from engaging in only one particular type of expressive conduct—namely, erotic dance. It doesn't cover any other form of expression or, for that matter, even to any other form of dancing. The restriction thus applies "'to particular speech because of the . . . idea or message expressed'"—quite literally the definition of a content-based regulation. *TikTok Inc. v. Garland*, 145 S. Ct. 57, 67 (2025) (quoting *Reed*, 576 U.S. at 163).

Why, then, should we blink reality and "treat" this self-evidently content-based restriction "as if" it were content-neutral? Because a quirk of First Amendment jurisprudence requires us to do so. In *Renton*, the Supreme Court upheld a local zoning ordinance that limited the locations in which adult movie theaters could operate. *See* 475 U.S. at 43. Though the law was most certainly content-based in that it applied only to cinemas screening a particular type of film—*i.e.*, adult pictures—the Court reasoned that the restriction should be regarded as content-neutral because the government's primary interest wasn't to censor the movies' messages but, rather, "to combat the undesirable secondary effects of such businesses." *Id.* at 49.

The problem, as I see it, is that the government's subjective motivation for imposing a speech restriction—whether virtuous, wicked, or somewhere in between—has nothing to do with the threshold question whether the restriction is, objectively, content-based or content-neutral. That's a determination to be made on the face of the restriction, not on the government's underlying purpose or intent. The Supreme Court said so expressly in *Reed*.

21-12314                    Newsom, J., Concurring                    3

There, the Court considered a challenge to a city ordinance that categorized signs based on the messages they conveyed—political, ideological, etc.—and subjected each to different restrictions. *See* 576 U.S. at 159–61. The Court squarely rejected the Ninth Circuit's recharacterization of the facially content-based regulation as content-neutral on the ground that it didn't appear to have been motivated by any illicit consideration: "A law that is content based on its face," the Court said, "is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of 'animus toward the ideas contained' in the regulated speech." *Id.* at 165 (citation omitted). "In other words," the Court reiterated, "an innocuous justification cannot transform a facially content-based law into one that is content neutral." *Id.* at 166. "That," the Court explained, "is why [it has] repeatedly considered whether a law is content neutral on its face *before* turning to the law's justification or purpose." *Id.* (citing, *e.g.*, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 563–66 (2011), *United States v. Eichman*, 496 U.S. 310, 315 (1990), and *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984)).

That seems exactly right to me. A speech regulation is either content-based or it isn't—and its categorization as such is a function of its text, not its supposed subtextual purpose. That's not to say that a government's objective is irrelevant. Of course not. To the contrary, the worthiness and weight of the government's justification plays an important role—but only downstream of the initial decision whether the restriction is content-based or content-neutral. In particular, it enters the show in act two, when the court

examines the significance of the government's regulatory interest and the relationship between that interest and the law's classification.  So, for instance, if a law is content-based, it'll be subject to strict scrutiny, requiring the government to demonstrate that it serves a "compelling state interest[]" and is "narrowly tailored" to that end.  *TikTok*, 145 S. Ct. at 67 (quoting *Reed*, 576 U.S. at 163).  And if a law is content-neutral, it'll be subject to intermediate scrutiny, under which the government must prove that it advances an "important governmental interest[]" and "does not burden substantially more speech than necessary."  *Id*. (quoting *Turner Broadcasting System, Inc. v. FCC*, 520 U.S. 180, 189 (1997)).  In either case, the stronger the government's interest—the more consequential its objective—the more likely its restriction is to survive.  And it strikes me, anyway, that combatting the sort of "secondary effects" at issue here—most notably, the sex trafficking of young women—is a pretty strong interest, indeed.

But the secondary-effects inquiry shouldn't be allowed to jump the queue.  A restriction's justification should be considered not when *determining* which level of scrutiny to apply, but rather, in *applying* that scrutiny once determined.  By permitting a secondary-effects justification to transform what was clearly a content-based law into a content-neutral one, the *Renton* Court improperly conflated the level of scrutiny and its ensuing application.

What's the big deal, one might reasonably ask?  Why should we care whether the secondary-effects inquiry is conducted ex ante or ex post?  Well, sometimes it matters—and in this case I think it

21-12314                    NEWSOM, J., Concurring                    5

may well be dispositive. Here's why: As the majority opinion explains, bound as we were by *Renton*—and its upfront treatment of secondary effects—we were obliged to "treat" Jacksonville's ordinance "as if" it were content-neutral, and thus to apply *O'Brien*-style intermediate scrutiny. Under that standard (in its most simplified version) a "law will be upheld if (1) [it] is grounded in a substantial governmental interest, and (2) the incidental restriction on speech is no broader than necessary to further that interest." *Club Madonna Inc. v. City of Miami Beach*, 42 F.4th 1231, 1242 (11th Cir. 2022). Significantly, *O'Brien*'s test serves only to invalidate restrictions that are overinclusive—that is, those that are "broader than necessary." *Id.* And, as the majority opinion explains, the restriction here isn't, so it survives.

Had we been free to evaluate the ordinance as the content-based restriction it truly is, we would have applied strict scrutiny. Under that standard—to repeat—a law "may be justified only if the government proves that [it is] narrowly tailored to serve compelling state interests." *TikTok*, 145 S. Ct. at 67 (quoting *Reed*, 576 U.S. at 163). And strict scrutiny's narrow-tailoring component generally requires that a law be neither overinclusive nor (at least substantially) underinclusive. *Cf. Williams-Yulee v. Florida Bar*, 575 U.S. 433, 448–49 (2015) (stating that while "the First Amendment imposes no freestanding 'underinclusiveness limitation,'" a "law's underinclusivity raises a red flag," for instance by sowing "doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint" (citations and quotation marks omitted)). And while Jacksonville's ordinance

6                    NEWSOM, J., Concurring                    23-10801

may not be *over*inclusive, it is meaningfully *under*inclusive in that it fails to cover non-dancer strip-club employees under the age of 21 who, according to the city's own evidence, are subject to the same human-trafficking risk—the very secondary effect that the restriction seeks to address.

★  ★  ★

My takeaway: So long as the Supreme Court continues to hold that erotic dancing and the like are protected by the First Amendment, there will be a fatal disconnect between the logic of *Renton* and *Reed*. And as between the two, *Reed*—pursuant to which a law's characterization as content-based or -neutral results from an examination of its terms, not its underlying purpose— seems to be on much firmer footing.